IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
| Plaintiff, | ) ) | Case No. 10-6139 |
| and | ) ) | |
| REGINALD BAILEY, et al. Intervening-Plaintiffs, | ) ) ) | Judge John Z. Lee Magistrate Judge Gilbert |
| v. | ) ) | |
| DHL EXPRESS (USA), INC., Defendant. | ) ) ) | |

**EEOC'S OPPOSITION TO DHL'S MOTION TO STRIKE THE NEW EXPERT REPORT OF DR. THOMAS DIPRETE**

Dr. Thomas DiPrete's Declaration submitted in opposition to DHL's summary judgment motion should not be stricken as it simply sets forth factual data from a database which was provided to DHL during discovery. The Declaration is *not* a new expert report as DHL contends. It does not include any opinions, analyses, or conclusions, new or otherwise. Rather, it merely identifies and compiles lists of some of the data inputs that were used in the regression analyses contained in DiPrete's original expert report ("Report"). Case law makes clear that experts may present such factual data or subsidiary details underlying their reports after the close of expert discovery. Accordingly, DHL's motion to strike should be denied.

**BACKGROUND**

DHL contends that in preparing his Declaration, DiPrete for the first time analyzed race and crime data on a stop-by-stop basis, including calculating the Black population density and crime rates for each stop serviced by a Black driver, and identifying stops with Black population

1

density above 50% and 70% and certain crime characteristics. Dkt. #297, Mem. in Support of DHL's Motion to Strike the New Expert Report of Dr. Thomas DiPrete at pp. 1, 6-7 ("Def. Mem."). DHL is wrong on all counts. These analyses are all included in Dr. DiPrete's Report, produced to Defendant on or about June 22, 2015. That Report included numerous stop-level analyses, for which he had to determine for each stop driven by each driver the Black population density, including those stops in areas with Black population density above 50% and 70%, as well as property and violent crime rates in those areas. *See, e.g.*, DiPrete Report at ¶¶ 38-45, Tables 5-10 (attached as Exhibit C to DHL's Motion to Strike, Dkt. No. 297-3).

To perform the analyses that were included in his Report, DiPrete compiled a database containing several data points related to each stop. The data points in that database included information about the drivers, stop locations, stop dates and times, and the racial composition, Black population density, and crime rates for various neighborhood boundaries surrounding each stop. This database (DHL_detail_2010tract_route.dpa) ("2010 tract database") was produced to DHL on or about June 22, 2015, along with the Report.

## ARGUMENT

Diprete's Declaration simply identifies and summarizes a subset of data inputs that were included in the database upon which he conducted his regression analysis (as part of his original expert report). Case law makes clear that declarations that summarize factual data, or that provide subsidiary, evidentiary details, are permitted after the close of expert discovery. *See Cedar Petrochemicals, Inc. v. Dongbu Hannog Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (denying motion to strike declaration that provides evidentiary details for the conclusions contained in the expert's report); *U.S., et al. v. Dish Network, LLC*, No. 09-3973, 2015 WL 2265800, at *7 (C.D. Ill. May 13, 2105) (after close of expert discovery, expert permitted to

summarize factual data underlying expert opinion where database had been produced to opposing party); *Mass. Mut. Life Ins. v. DB Structured Prods., Inc., et al.*, No. 11-30039, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (expert declaration submitted in response to summary judgment permitted where consistent with report and merely provides subsidiary details, support or elaboration); *Khan v. Kir Tampa 003, LLC*, No. 14-cv-1683, 2015 WL 8207813, at *4 (M.D. Fla. Dec. 7, 2015) ("[C]ourts will not strike otherwise belated [submitted in response to summary judgment motion] expert affidavits that provide evidentiary details for the conclusions originally espoused in the expert's report"). Such declarations, unlike new reports that set forth wholly new analyses and opinions or opinions that contradict or fall outside the original report, do not risk ambushing an opponent or belatedly sending a case on a wholly different track. *See Mintel Int'l Grp., Ltd. v. Neergheen*, 636 F. Supp. 2d 677, 685-686 (N.D. Ill. 2009); *Rowe Int'l Corp. v. Ecast, Inc.*, 586 F. Supp. 2d 924, 935 (N.D. Ill. 2008); *Solaria, LLC v. Arvin Meritor, Inc., et al*, 361 F. Supp. 2d 797, 806-07 (N.D. Ill. 2005).

### A. DiPrete's declaration is within the scope of his original Report.

DiPrete's Declaration is within the scope of his original Report in that it provides subsidiary details and evidentiary support for his opinion that Black drivers in the aggregate were, to a statistically significant degree, more likely to make stops in neighborhoods that were more Black and had higher property and violent crime. The details he offers in his Declaration are contained in the database of individual stops made by individual drivers upon which he did his regression analyses. Contrary to DHL's assertion, these subsidiary details about stops made by individual drivers are *not* inconsistent with his deposition testimony, set forth on page three of Defendant's memorandum, that his regression analysis does not allow him to make statements about specific claimants or observations. Regression analyses, by their very nature, do not

3

address individual observations, but rather address observations in the aggregate. However, the aggregate observations are based on underlying individual observations.

Presenting the lists contained in DiPrete's Declaration involved simply identifying within the existing data underlying the Report stops made by Black claimant-drivers with certain population or crime characteristics. In his Report, DiPrete had calculated the probability that a Black driver would drive in an area where the Black population exceeded 50% or 70%, finding that the probability that a Black driver drove in those neighborhoods was much higher than that of a White driver. DiPrete Report at ¶¶ 44-45, Tables 9 and 10. Implicit within those analyses is that individual Black drivers drove in areas where the population exceeded 50% or 70% Black. In his Declaration, he simply identified from the database specific Black claimants who made stops in areas where the Black population exceeded 50% or 70%.

DiPrete also identified in his Declaration Black claimants who had stops in census tracts that had property crime or violent crime rates two or more standard deviations above the mean of property and violent crime rates for the census tracts included within his regression analyses; in other words, he identified specific drivers who had stops in areas with the highest relative crime rates. He calculated the mean and standard deviation, and then included within his computer code an instruction to identify the Black drivers who made at least one stop in a census tract that had a violent or property crime rate more than two standard deviations above the mean.[1]

**B.     DiPrete's Declaration and Report are based on the same database.**

DiPrete did not base his Declaration on a different database, containing double the number of observations as that used to prepare his Report, as DHL contends. The 2010 tract database used for both his Declaration and Report contains 10.8 million records, but as explained

---

[1] Calculating the mean and standard deviation does not render the Declaration a new report. *See Dish Network,* 2015 WL 2265800, at *7 (after the close of expert discovery, expert permitted to make comparison of data points which underlie his report).

in DiPrete's Report at ¶35, only 52% of those records include a match between the pickup and delivery data and a specific black or white driver identified in the staffing data produced by DHL. Thus, in compiling for his Declaration the lists of drivers who had stops in census tracts with certain demographic or crime characteristics, records for which there is no match between a driver and a stop will not trigger a hit, as there is no information in the dataset identifying the driver for that stop. Therefore, DHL's claim that the Declaration is based on different data, using double the number of observations as part of some nefarious effort to find more helpful data, is simply wrong.

C.  **DiPrete's use of a computer code to find data did not involve additional analysis.**

Rather than manually reviewing millions of data records to prepare his Declaration, DiPrete wrote a computer code to extract the data. The code is the functional equivalent of filtering an Excel database or using the "find" feature to search a word processing document or webpage to locate specific information contained in the database or document. The mere fact that DiPrete used a code to automate a task does not mean that he conducted additional analyses or rendered new opinions. His Declaration identifies specific pieces of data, from the database which DHL has. As with any other evidence, DHL can dispute its accuracy and significance, or present conflicting evidence. For example, DHL could dispute that Maxwell Akenten drove in an area that had a Black population density of more than 70% Black and violent and property crime rates more than two standard deviations above the mean, just as it could dispute that someone pulled a gun on Akenten when he was driving his route. Dkt. #290, Plaintiff's Local Rule 56.1(b)(3)(a) Statement of Additional Facts, ¶ 27(a). All of this evidence is factual information, which DHL is free to contest or not.

**D.  DiPrete did not conduct a new stop-level analysis.**

DHL's contention that DiPrete conducted a "completely new analyses of individual claimant route assignments on a stop-by-stop basis," and that it is being denied the opportunity to challenge his analyses, is misguided. Def.'s Mem. at pp. 2, 6-7. First, DiPrete's Declaration contains *no* analysis. DHL can dispute the data cited in his Declaration, but there is no *analysis* to challenge. Second, to the extent DHL is suggesting that DiPrete's Report did not include any stop-by-stop analysis, it is wrong. DiPrete's Report includes the results of many different regressions analyzing the neighborhood characteristics of individual pick up and delivery stops. *See, e.g.*, DiPrete Report at ¶¶ 38-45, Tables 5-10. Looking at the neighborhood characteristics of individual stops is nothing new. DiPrete's Report describes the output of his data analyses of, among other things, stops made by DHL drivers. His Declaration merely highlights a small number of the data inputs upon which his Report was based.

**E.  DiPrete's Declaration does not contain a threshold or opinion of dangerousness.**

Contrary to DHL's contention, *see* Def.'s Mem. at pp. 2, 8-9, DiPrete's Declaration contains no opinion regarding an objective threshold for what constitutes a "high crime" or "dangerous" area. Indeed, DHL acknowledges that DiPrete's Declaration is silent on this issue, as it says that DiPrete "tacitly concludes" that a location with crime two standard deviations above the mean is "dangerous." *Id.* at 9. DHL is reading into DiPrete's Declaration an opinion that is not there. His Declaration lists claimants who had at least one stop in a census tract that had the relatively highest crime rates of the census tracts included within his analysis. Like his Report, his Declaration does not contain any characterization as to whether such areas are dangerous, high crime, or undesirable. DHL's complaint that DiPrete did not calculate or opine on whether crime rates more than two standard deviations above the mean are statistically

significant is nonsensical, as DiPrete's Declaration is not based on any statistical analysis of which to calculate the statistical significance.

**F.     The cases cited by DHL are inapposite.**

None of the cases DHL cites in support of its motion addresses the factual circumstances here, where an expert declaration does not include new opinions, analyses, or conclusions. Rather, the majority of cases cited by DHL involve declarations or submissions that contain entirely new opinions. For example, DHL relies on *Lexington Insurance Co.* to support its claim that a court can "strike a 'supplemental' report not based on any new information," but DHL misstates that court's ruling. Def.'s Mem. at p. 11.[2] Instead, the *Lexington* court made the opposite conclusion - that what a party described as "supplemental" was not supplemental but instead contained new information and should be stricken. *Lexington Ins. Co. v. Horace Mann Ins. Co.,* No. 11 C 2352, 2015 WL 5174159, at *10 (N.D. Ill. Aug. 27, 2015) ("Horace Mann is seeking to introduce entirely new opinions on a previously unaddressed topic, more than a year" after rebuttal reports were submitted); *see also Stuhlmacher v. Home Depot U.S.A., Inc.*, No. 10-c-467, 2012 WL 5866297, at *3 (N.D. Ind. Nov. 19, 2012) (supplemental expert report stricken that sets forth a new potential cause for accident in product liability case); *Rowe,* 586 F. Supp. 2d at 935 (N.D. Ill. 2008) (new opinions in expert declaration stricken); *Baker v. Indian Prairie Cmty. Unit, Sch. Dist. 204,* No. 96-3927, 1999 WL 988799, at *11-13 (N.D. Ind. Nov. 19, 2012) (portions of expert declaration in negligence action that put forth a new cause for the accident were stricken).

DHL also cites *Hard Surface Solutions., Inc.* to support its claim that late disclosures are harmful, even if a trial date is not set. There, the court struck an expert disclosure that was

---

[2] DHL cites page *6 of *Lexington*, but that page merely summarizes the movant's argument and provides the standard for supplemental reports under Fed. R. Civ. P. 26(e). 2015 WL 5174159, at * 6.

7

provided for the first time three months after expert disclosures were due, and the late disclosure failed to comport with Fed. R. Civ. P. 26(a)'s requirements. *Hard Surface Sols., Inc. v. Sherwin-Williams Co.,* 271 F.R.D. 612, 613-15 (N.D. Ill. 2010). In that situation, where the expert had not been disclosed, the disclosures could only be construed as new, and is thus inapplicable here. *Id.* DHL relies on another case where an expert was disclosed for the first time at summary judgment, past the disclosure deadline – facts entirely different from those here. *Bull v. Bd. of Trs. of Ball State. Univ.*, No. 00878-JMS-TAB, 2012 WL 76137, at *3 (S.D. Ind. Jan. 10, 2012). And in *Bull*, the court declined to strike the expert disclosure because it found any potential harm could be cured, as the court had not yet ruled on summary judgment. *Id.*

**G.     If the Court finds any harm, it can be cured.**

Even if the Court finds that DiPrete's Declaration constitutes a new expert opinion and that DHL has been harmed thereby, the Declaration should not be stricken because any prejudice can be cured by allowing DHL to re-depose DiPrete. In the Seventh Circuit, the discretion to impose sanctions (such as that sought by DHL's request that the Court strike DiPrete's declaration), is guided by four interrelated factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (the ultimate question is one of harm or prejudice). Here, all four of the factors weigh against exclusion of DiPrete's Declaration. First, DHL has not been prejudiced because all the information set forth in DiPrete's Declaration is contained in the database previously produced to DHL. Second, even if DHL has been harmed, the harm can be cured by allowing DHL to re-depose DiPrete. Third, there is no

8

likelihood of disruption of the trial, as no trial date has been set. And, fourth, EEOC did not act in bad faith. It was not trying to hide any evidence or ambush DHL. Rather, EEOC's intent was simply to set forth the subsidiary details of DiPrete's analysis -- details that were already in DHL's possession.

## **CONCLUSION**

The Court should not strike DiPrete's Declaration because it contains no new opinions. Therefore, EEOC respectfully requests that the Court deny DHL's Motion to Strike.

Dated: June 27, 2017

Respectfully submitted,

s/*Laurie S. Elkin*
Laurie S. Elkin
Laura R. Feldman
Bradley S. Fiorito
Ann M. Henry
Equal Employment Opportunity Commission
500 W. Madison St., Ste. 2000
Chicago, IL 60661
(312) 869-