**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **REGINALD BAILEY, KENNETH BRISCOE, OLIVER DEAN, MELVIN EDWARDS, JOHN ELLIS, RONNIE FORD, BENITA GREEN-RILEY, NATHANIEL JACKSON, MICHAEL JOHNSON, ANTHONY JORDAN, MIRANDA LESTER, SANDRA McNEELY, EDGAR MEDLEY, TIMOTHY PRICE, ALONZO STUDSTILL, PAUL THOMAS, RANDY THOMPSON, SHAREE WASHINGTON, GEORGE WHITE, and SANDRA WILLIAMS,**[1] | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **No. 10 C 6139**   **Judge John Z. Lee** |
| | ) | |
| **Intervenor-Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DHL EXPRESS (USA), INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER**</u>

On behalf of eighty-three truck drivers, the Equal Employment Opportunity Commission

("EEOC") has sued DHL Express (USA), Inc. ("DHL") for discrimination on account of race[2] in

---

[1]    The caption of the first amended complaint misspells Kenneth Briscoe's and Sharee Washington's names.  The Court has corrected the spelling.

[2]    Plaintiffs refer to their race as "Black," and the Court will follow suit.  *See, e.g.*, *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 857 (7th Cir. 2010) ("Swearnigen refers to his race as 'Black' so we will do the same.").

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Specifically, the EEOC alleges that DHL assigned Black truck drivers to more dangerous or demanding routes, tasked them with more arduous dock work, and segregated them from white drivers. Twenty-one of these drivers have intervened and additionally assert a claim under Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("section 1981").[3] DHL has moved for summary judgment as to the EEOC's claims, the intervenors' claims, and their requests for punitive damages. For the reasons below, the motion is granted in part and denied in part.

## I.    Background[4]

### A.    The Parties

DHL provides express shipping services. Def.'s LR 56.1(a)(2) Statement of Facts ("DSOF") ¶ 1, ECF No. 365. During the time frame relevant to this lawsuit, DHL operated regional shipping stations in Alsip (also known as Midway), Lisle, and Franklin Park, Illinois, among other places. *Id.*; *see* Def.'s Ex. 5, Bailey Dep. ("Bailey Dep.") at 40:21–41:7, ECF No. 366-1. The parties consistently refer to these stations by code name, and the Court similarly will refer to the Alsip shipping center as "JOT," Lisle as "DPA," and Franklin Park as "ORD." DSOF ¶ 4. After undergoing corporate restructuring in 2008, DHL consolidated the operations of the JOT and DPA stations within the ORD facility. *Id.* ¶ 2.

Within each of DHL's shipping stations, Field Service Supervisors ("supervisors") assign drivers to different routes and dock work . Def.'s Ex. 89, Colella Dep. ("Colella Dep.") at 7:17–

---

[3]    One of the intervenors, Nathaniel Jackson, also alleges race and religion discrimination, because DHL denied him a ramp slot position that would have provided overtime opportunities and disciplined him for requesting a Jewish holiday as a vacation day at DHL's downtown Chicago station (which the parties refer to as "CHI"). *See generally* Intervenor N. Jackson Compl. ("N. Jackson Compl."), ECF No. 128.

[4]    Unless otherwise noted, the following facts are either undisputed or have been deemed admitted due to a party's failure to comply with Local Rule 56.1.

23:9, ECF No. 366-5. Supervisors are authorized to discipline a driver and are not required to seek approval to do so. *Id.* at 10:16–21; Def.'s Ex. 88, Brandt Dep. ("Brandt Dep") at 36:3–9, ECF No. 366-5; Def.'s Ex. 90, Montgomery Dep. ("Montgomery Dep.") at 13:13–14:13, ECF No. 366-5; Def.'s Ex. 95, Sintich Dep. ("Sintich Dep.") at 23:5–7, ECF No. 366-5. Supervisors also may recommend to the station's manager that a driver be terminated. *See* Brandt Dep. at 35:9–11; Montgomery Dep. at 13:13–14:13; Sintich Dep. at 23:16–19.

The EEOC is a federal agency authorized to bring actions to enforce Title VII. *See* 42 U.S.C. § 2000e–5(f)(1), (3). The EEOC claims that DHL supervisors at JOT and DPA issued route assignments in a discriminatory manner from 2005 to 2009. It also asserts that supervisors at ORD engaged in a similar practice from 2009 to the present. In addition, the EEOC alleges that supervisors at all three shipping centers assigned dock work based upon an individual's race and segregated employees into different races since 2005. The EEOC has brought this enforcement action on behalf of eighty-three Black truck drivers currently or formerly employed at JOT, DPA, and ORD. *Id.* ¶ 4.

The drivers include:

| | |
|---|---|
| 1. Akenton, Maxwell | 17. Fefee, David |
| 2. Allen, Calvin | 18. Percy Fields |
| 3. Anderson, Darrell | 19. Ford, Ronnie* |
| 4. Azor, Philip | 20. Foster, DeMarco |
| 5. Bailey, Reginald* | 21. Fulks, Michael |
| 6. Bonslater-Burnett, Alma | 22. Gilbert, Paul |
| 7. Brantley, Andrea | 23. Green, Nicholas |
| 8. Briscoe, Kenneth* | 24. Green-Riley, Benita* |
| 9. Britton, Thomas | 25. Haven, Johann |
| 10. Brown, Derwin | 26. Hayes, Jimmie |
| 11. Buffkin, Shuray | 27. Hill, Felicia |
| 12. Calhoun, Anthony | 28. Hopkins, Philip |
| 13. Cummings, Kevin | 29. Huggins, Lisa |
| 14. Dean, Oliver* | 30. Jackson, Demario |
| 15. Edwards, Melvin* | 31. Jackson, Nathaniel* |
| 16. Ellis, John* | 32. Johnson, Christopher |

33. Johnson, JC
34. Johnson, Michael*
35. Jones, Joseph
36. Jones, Sean
37. Jordan, Anthony*
38. Kelly, Allan
39. Kelly, Reginald
40. Lester, Miranda*
41. Lewis, Leslie
42. Lowe, Michael
43. Lyons, Robert
44. Martin, Charles
45. May, Edward
46. McCall, Anthony
47. McNeal, Aldrich
48. McNeely, Sandra*
49. Medley, Edgar*
50. Miller, Erskine
51. Murphy, Alonzo
52. Noys, Antonio
53. Oliver, Landers
54. Perry, Angela
55. Price, Timothy*
56. Quarles, Chris
57. Reams, Lewis
58. Redd, Willie

59. Robertson, Allan
60. Robinson, Aubrey
61. Robinson, Ryan
62. Robinson, Sharon
63. Scott, John
64. Shields, Millicent
65. Singleton, Renard
66. Smart, Kirby
67. Smith, Curtis
68. Smith, Darrell
69. Smith, William
70. Stewart, Gregory
71. Stewart, Loron
72. Street, Toxey
73. Studstill, Alonzo*
74. Thomas, Paul*
75. Thompson, Randy*
76. Thornton, Jerry
77. Washington, Sharee*
78. Wetherspoon, Ricky
79. White, George*
80. Williams, Arthur
81. Williams, Sandra*
82. Willis, Sheldon
83. Young, Jamaine

EEOC & Intervenors' LR 56.1(b)(2) Statement of Additional Facts ("PSOAF") ¶ 2, ECF No. 374.

(An asterisk next to a driver's name denotes that the driver has intervened in the case.)

DHL drivers typically pick-up and deliver parcels along routes within DHL's service areas. DSOF ¶ 5. They also perform dock assignments such as loading, unloading, and sorting freight and letters. *Id.*

Drivers are subject to a collective bargaining agreement ("CBA"). *Id.* ¶ 23. Under the CBA, the particular shipping center and time slot to which a driver is assigned depends largely on her seniority. *Id.* A driver can bid for a time slot and shipping center through an annual bidding process. *Id.* Once a driver is assigned to a center and a time slot, however, routes and dock work are allocated by supervisors. *Id.* ¶ 24; PSOAF ¶¶ 19, 85; Colella Dep. at 7:17–23:9.

B.      **Procedural History**

Before the case was assigned to this Court, DHL moved for partial summary judgment before then-District Judge Amy St. Eve.  Judge St. Eve granted the motion as to certain intervenors' individual discrimination claims and denied the motion as to the EEOC's claims on behalf of those intervenors.  *EEOC v. DHL Exp. (USA), Inc.*, No. 10 C 6139, 2011 WL 1326941, at *1 (N.D. Ill. Apr. 7, 2011).  Summary judgment was awarded in DHL's favor as to claims brought by six intervenors, because they had signed waivers and releases as part of DHL's Voluntary Separation Programs.  They are (1) Reginald Bailey, (2) Benita Green-Riley, (3) Anthony Jordan, (4) Sandra McNeely, (5) Randy Thompson, and (6) Sandra Williams.  *Id.* at *9; *see* Pls.' Resp. DSOF ("Resp. DSOF") ¶ 31, ECF No. 368.  Fourteen other intervenors did not sign the waiver and release, and their claims remain.  These intervenors are: (1) Kenneth Briscoe, (2) Oliver Dean, (3) Melvin Edwards, (4) John Ellis, (5) Ronnie Ford, (6) Nathaniel Jackson, (7) Michael Johnson, (8) Miranda Lester, (9) Edgar Medley, (10) Timothy Price, (11) Alonzo Studstill, (12) Paul Thomas, (13) Sharee Washington, and (14) George White (collectively, the "remaining intervenors").

In addition to the claims asserted by the individual intervenors, the EEOC also filed claims on their behalf.  In response, DHL sought summary judgment as to the EEOC's claims related to the six drivers, whose individual claims were dismissed, but Judge St. Eve denied that request, explaining that the EEOC's "enforcement authority is not derivative of the legal rights of individuals even when it is seeking to make them whole."  *E.E.O.C. v. DHL Exp. (USA), Inc.*, 2011 WL 1326941, at *4 (quoting *EEOC v. Sidley Austin LLP*, 437 F.3d 695, 696 (7th Cir. 2006)).

In the end, what remains before this Court are the EEOC's claims on behalf of all eighty-three drivers (including all twenty intervenors), as well as the individual claims of the fourteen intervenors, who did not sign a waiver and release.

## C.     Alleged Discrimination at JOT, DPA, and ORD

The EEOC and the remaining intervenors claim that DHL supervisors discriminated against them due to their race at one or more of the three DHL stations at issue. Specifically, they contend that they were assigned more dangerous and demanding routes and more arduous dock work and were subjected to segregation.[5]

### 1.     JOT (Alsip)

The claims related to JOT are based upon incidents that occurred at that facility from 2005 until the station's closure sometime in 2009. *See* DSOF ¶ 2.

#### a.     JOT Supervisors and Routes

Between 2005 and 2009, Frank Pehlke, Robert Sintich, and Steven Szajkovics supervised the morning shift, and Rocco Colella, William Ehrhart, Robert Guerrero, and Anthony Matwij supervised the afternoon shift. PSOAF ¶¶ 3, 47; Colella Dep. at 6:14–14:6.; *id.* at 32:11–20; Sintich Dep. at 12:3–14. During the morning shift, Pehlke, Sintich, or Szajkovics were responsible for assigning routes. Sintich Dep. at 15:16–17:24. In the afternoon shift, Matwij and Ehrhart assigned routes, while Colella, Ehrhart, Guerrero, and Matwij delegated dock work. Colella Dep. at 11:14–12:12, 13:17–14:6, 18:4–12.

All of these supervisors reported to Manager Greg Kogut until 2007, and to Managers Chad Radcliff and Brandon Zobel from 2007 to 2009. Colella Dep. at 8:2–9:10; Def.'s Ex. 98, Kogut

---

[5]     Although DHL argues that certain drivers have not established that they drove a route or performed arduous dock work during the relevant time period, except where specifically noted below, the Court has concluded, based on the drivers' deposition testimony, that a reasonable jury could conclude otherwise.

Decl. ("Kogut Decl.") ¶¶ 2–3, ECF No. 366-7; *see also* Intervenors' Ex. 8, Pope Dep. ("Pope

Dep.") at 34:14–35:3, ECF No. 372-1.

JOT serviced the following Chicago neighborhoods, listed by route:

| | |
|---|---|
| Ashburn | Englewood/Auburn Gresham |
| Bedford Park/Chicago Lawn | Hegewisch |
| Beverly | Morgan Park |
| Calumet/Blue Isl./Evergreen | Roseland/Riverdale/Calumet |
| Chatham/Chesterfield | S. Deering/Burnham/Calumet |
| | S. Chicago/S. Shore |

PSOAF ¶ 11.[6]

JOT also serviced routes in the following suburban areas:

| | | |
|---|---|---|
| Alsip | Flossmoor | Oak Forest |
| Batavia | Ford Heights Geneva | Oak Lawn |
| Beverly | Glen Ellyn Harvey | Orland Park |
| Bridgeview | Harvey | Orland Sq. Mall |
| Blue Island | Hazel Crest | Palos Heights |
| Burnham | Hickory Hills | Palos Park |
| Burr Ridge | Homewood | Plainfield |
| Calumet City | Homer Glen | Riverdale |
| Calumet Park | Lemont | Romeoville |
| Carol Stream | Lockport | S. Hazel Crest |
| Chicago Heights | Lombard | South Holland |
| Crestwood/Midlothian | Markham | St. Charles |
| Crete | Matteson | Tinley Park |
| Darien | Monee/ Richmond | Warrenville |
| Dixon | Park | Wheaton |
| Dolton | Naperville | Willow Brook |
| Evergreen Park | Oakbrook | Woodridge |

---

[6]     Although certain routes have been listed solely by zip code, for the ease of the reader, the Court takes judicial notice of the neighborhoods within the zip code.

*Id.* Additionally, JOT routes serviced certain areas in Indiana, including: Cedar Lake, Crown Point, East Chicago, Gary, Hammond, Highland, Lake Station/Hobart, Lansing, Marysville, Muenster, and Schererville. *Id.*[7]

---

[7]    Based on their own observations and experiences, drivers described the South Side of Chicago and certain south suburbs, such as Bronzeville, Englewood, Woodlawn, South Shore, Chatham, Roseland, West Pullman, Pullman, Altgeld Gardens, South Deering, Auburn, Gresham, Harvey, Riverdale, Dolton, Dixon, Markham, Burnham, Calumet City, Calumet Park, the East Side of Beverly, Chicago Heights and Ford Heights, Robbins, Hazel Crest, South Hazel Crest, as well as Gary, Indiana, as being predominantly Black neighborhoods. *See, e.g.*, Def.'s Ex. 4, Azor Dep. at 46:19–23 ("Azor Dep."), ECF No. 366-1 (Englewood and South Shore); Bailey Dep. at 137:5–12 (parts of Bronzeville), 97:8–14 (Gary); Def.'s Ex. 13, Cummings Dep. ("Cummings Dep.") at 29:8–18, 33:11–16, 79:12–14, ECF No. 366-1 (Englewood, Roseland, West Pullman, South Deering, Bronzeville, Markham, Dolton, and Chicago Heights); Def.'s Ex. 16, Ellis Dep. ("Ellis Dep.") at 16:5–10, ECF No. 366-1 (Gresham), Def.'s Ex. 18, Fields Dep. ("Fields Dep.") at 110:5–15, ECF No. 366-1 (Harvey, Markham, Dolton); Def.'s Ex. 20, Foster Dep. ("Foster Dep.") at 34:16–21, ECF No. 366-1 (Chatham, South Shore, Englewood); Def.'s Ex. 51, Miller Dep. ("Miller Dep.") at 44:24–48:7 (Woodlawn), 50:13–52:20 (Robbins, Hazel Crest, South Hazel Crest, Markham), ECF No. 366-3; Def.'s Ex. 49, McNeely Dep. ("McNeely Dep.") at 118:9–119:7, ECF No. 366-3 (Riverdale); Def.'s Ex. 62, R. Robinson Dep. ("R. Robinson Dep.") at 42:1–21, ECF No. 366-4 (Roseland, West Pullman, Altgeld Gardens, Englewood, Chatham, Auburn Gresham, Harvey, Dolton, Burnham, Calumet City, Calumet Park, the East Side of Beverly, Harvey, Dixon, Markham, Chicago Heights, Ford Heights); Def.'s Ex. 80, Wetherspoon Dep. ("Wetherspoon Dep.") at 105:21–106:22, ECF No. 366-4 (Pullman, West Pullman, Altgeld Gardens).

    Drivers also describe from their own observations and experiences that the routes that were in predominantly Black neighborhoods were also in higher-crime areas, including, for example, Englewood, Woodlawn, South Shore, Roseland, Altgeld Gardens, Pullman, West Pullman, Harvey, Riverdale, Dolton, Robbins, Hazel Crest, South Hazel Crest, Markham, Chicago Heights, and Ford Heights, Illinois, as well as Gary, Indiana. Bailey Dep. at 97:17–99:2; Def.'s Ex. 10, Brown Dep. ("Brown Dep.") at 30:20–31:5, ECF No 366-1 (Englewood, Roseland); Def.'s Ex. 14, Dean Dep. ("Dean Dep.") at 167:5–18, ECF No. 366-1 (Harvey, Riverdale, Dolton); Foster Dep. at 51:20–24 (Englewood, South Shore, Roseland); Def.'s Ex. 24, Green-Riley Dep. ("Green-Riley Dep.") at 49:9–50:7, ECF No. 366-2 (Chicago Heights, Ford Heights); Miller Dep. at 50:13–54:22 (Robbins, South Hazel Crest, Markham, Englewood, Woodlawn); Wetherspoon Dep. at 105:21–106:22 (Pullman, West Pullman, Altgeld Gardens). Drivers have also explained, in their own words, the correlation between a high Black population, the unemployment rate, and the prevalence of crime in a given area, and the Court concludes that a reasonable jury could find that such a correlation exists. *See, e.g.*, Cummings Dep. at 15:3–14, 28:21–29:7, 30:24–32:5; Fields Dep. at 42:9–43:16; Def.'s Ex. 66, Singleton Dep. ("Singleton Dep.") at 44:18–45:2, ECF No. 366-4.

    According to Singleton and David Fefee, Route 116, covering 130th and Torrence Avenue east of Highway 94 to 55th Street, and Route 117, covering the Southeast Side of Chicago, from East 67th Street to East 79th and from the Dan Ryan to Stony Island, not only covered predominantly Black communities in higher-crime areas, but also were busier routes. Singleton Dep. at 37:4–38:15, 109:18–20, 110:9–12; Def.'s Ex. 17, Fefee Dep. ("Fefee Dep.") at 27:19–24, 67:2–17, 106:3–108:9, ECF No. 366-1.

### b. Accounts of Discriminatory Route Assignments at JOT

James Long, an operation supervisor who worked at JOT in 2005, observed that route assignments were given out according to the race of the driver. PSOAF ¶ 41; Pls.' Ex. 4, DHL's Answers & Objs. Pls.' 3d Set Interrogs., Ex. B. ("DHL's Answers Interrogs."), ECF No. 369-2; Pls.' Ex. 10, Long Decl. ("Long Decl.") ¶¶ 1–4, ECF No. 369-2. Long saw that Black drivers were often assigned to longer and more difficult delivery routes than white drivers. Long Decl. ¶ 4. He also noticed that Black drivers were not given the same opportunities as white drivers to work on different delivery routes. *Id.* Although Long repeatedly requested that Black drivers cross-train on route assignments typically given to white drivers, Kogut denied his requests. *Id.*[8]

Several of the above-listed drivers describe the circumstances surrounding their route assignments at JOT between 2005 and 2009.[9] The following are examples of their accounts.

---

[8]    While DHL objects to Long's declaration as lacking foundation, the Court holds that Long's lengthy experience as an operations supervisor at JOT, his observations and knowledge of drivers at JOT during the relevant time period, and his supervision of delivery route assignments on at least one occasion provide a sufficient bases for his personal knowledge of the manner in which routes were assigned. See Long Decl. ¶¶ 1–4.

[9]    The EEOC has specifically omitted any JOT route claim in the Claimant Chart for the following drivers: Kevin Cummings, Antonio Noys, Lewis Reams, Sharee Washington, and Sandra Williams. *See* EEOC & Intervenors' Claimant Chart ("EEOC Claimant Chart"), ECF No. 368-1. This would appear to indicate that neither the EEOC nor the remaining intervenors who worked at JOT, including Sharee Washington, are asserting a race discrimination claim based on their route assignments at JOT.

Furthermore, the EEOC has not presented any facts on behalf of Calvin Allen, Philip Azor, Reginald Bailey, Derwin Brown, Oliver Dean, DeMarco Foster, Paul Gilbert, Nicholas Green, Aldrich McNeal, Sharon Robinson, Millicent Shields, and Gregory Stewart, to support a discrimination claim based on route assignments at JOT. *See* Def.'s Ex. 2, Allen Dep. ("Allen Dep.") at 52:17–53:2, ECF No. 366-1 (stating he was primarily on the dock at JOT and only occasionally drove a route if a driver was absent); Azor Dep. at 41:23–42:21 (filled in on Englewood route eight times, South Shore route five times, and Harvey route seven times in four years); Bailey Dep. at 50:17–52:23 (only mentioning route sought at CHI station); DHL's Answers Interrogs. (listing supervisors Murphy, Thomas, and Montgomery at CHI); Brown Dep. at 78:5–79:13 (describing JOT Midway route in 2007–08 as not being in a predominantly Black, higher-crime area), 84:24–85:2 (drove to Gary "every blue moon" at JOT), 85:7–86:4 (felt unsafe one time based on police presence for unknown incident); Dean Dep. at 65:22–66:66 (stating he had a route that involved picking up one stop and bringing it back and unloading it, without describing it as a heavy route or in a predominantly Black, higher-crime area); Foster Dep. at 90:1–19 (stating that he requested city routes at JOT because he was familiar with them and was quicker at them); Def.'s Ex. 22, Gilbert Dep.

While driving on the Chicago South Shore route through predominantly Black neighborhoods in 2005, JC Johnson became concerned for his safety after men harassed him while he made a delivery. Def.'s Ex. 33, JC Johnson Dep. ("JC Johnson Dep.") at 30:10–21, 61:23–24, 62:19–64:18, 73:11–13; 80:3–5; 91:2–5; 99:6–9, ECF No. 366-2; *see* PSOAF ¶ 31(b). He called Pehlke, who told him to deliver the packages or he would be fired. JC Johnson Dep. at 63:16– 64:14. Johnson suggested to Kogut that he assign a white driver named Mark Flanagan to the route, but Kogut said Flanagan would stick out like a sore thumb, whereas Johnson did not. *Id.* at 65:21–67:20; McNeely Dep. at 120:8–10 (describing Flanagan as a white male). Flanagan refused to drive the route, and, although Kogut promised to give him a new route, nothing changed. JC Johnson Dep. at 69:11–24, 74:2–75:23.

Erskine Miller was taken off of a route in Oak Lawn, which he considered a safe area. Matwij assigned that route to a new white driver named Dale, who had not driven the Oak Lawn route before. Matwij then assigned Miller to a route in Woodlawn, a predominantly Black area that he considered unsafe, because Dale did not want that route. Miller Dep. at 84:17–22, 92:3– 94:12; *see also* Fefee Dep. at 25:13–23 (describing Woodlawn as a predominantly Black area). When Miller complained, Matwij asked whether he was being insubordinate. Miller Dep. at 94:19–96:13. Miller explained that the South Side of Chicago, from 47th to 127th Streets and

---

("Gilbert Dep.") at 18:6–8, ECF No. 366-2 (disavowing JOT race discrimination claim); Def.'s Ex. 23, Green Dep. ("Green Dep.") at 65:4–65:14, ECF No. 366-2 (admitting there were no incidents that made him feel unsafe on route at JOT); Def.'s Ex. 48, McNeal Dep. ("McNeal Dep.") at 53:12–61:5, ECF No. 366-3 (explaining that he drove routes for two months but omitting any details about whether the routes were heavy or in high-crime areas or about discrimination regarding route assignment); R. Robinson Dep. at 38:7–12 (stating he worked at JOT "[a]bout 10 or 20 [times], maybe not even that much"); Def.'s Ex. 63, S. Robinson Dep. ("S. Robinson Dep.") at 33:2–4, ECF No. 366-4 (stating she worked fewer than five times at JOT); Def.'s Ex. 65, Shields Dep. ("Shields Dep.") at 47:1–12, ECF No. 366-4 (stating she only filled in on two JOT routes for a week each); Def.'s Ex. 71, G. Stewart Dep. at 41:1–45:5, 72:9–73:3, 88:9– 89:9, 101:8–14, ECF No. 366-4 (stating that he "loved" or was "happy with" his afternoon JOT routes through Hobart and Crown Point, Indiana in 2005–06 and that he only drove predominantly Black, higher-crime Chicago routes six or seven times total); EEOC Claimant Chart, S. Robinson entry (route claim solely cites PSOAF ¶¶ 15–16, paragraphs that were intentionally left blank).

from Lake Street to Western Avenue, as well as the west side of Chicago, from Lake Street to Roosevelt Road and from Harlem Avenue to California Avenue, were predominantly Black neighborhoods, which, to him, meant that these areas had 90% Black residents.  *Id.* at 41:7–21.

Jerry Thornton was assigned to routes in Englewood, Roseland, South Shore, and the South Side of Chicago.  Def.'s Ex. 77, Thornton Dep. ("Thornton Dep.") at 71:13–16, ECF No. 366-4.[10] While delivering a package to a resident in Englewood, fifteen police officers pulled up with their weapons drawn and asked him questions, which horrified him.  *Id*. at 6:7–12, 71:9–74:7.  He reported the incident to Pehlke, who told him to finish his route.  *Id.*  Thornton complained to Szajkovics, Sintich, Colella, and Pehlke about being assigned to routes in Black neighborhoods and to heavy routes, but nothing changed.  *Id.* at 54:6–55:17, 105:10–106:23.  Afraid of being fired, he did not file a grievance with the union.  *Id.* at 58:14–59:15.

John Scott was robbed while driving the Englewood route, and although he repeatedly asked Sintich for a safer route, Sintich refused to assign one to him.  Def.'s Ex. 64, Scott Dep. ("Scott Dep.") at 47:22–49:22, 51:10–20, ECF No. 366-4.  In addition, Scott was shot at while driving a route in Riverdale, a neighborhood on the far South Side of Chicago.  Scott Dep. at 38:13–39:8.  Scott called Sintich to summon the police, but Sintich just told him to keep making deliveries.  *Id.* at 39:5–12.  The next day, Scott asked Sintich for a different route, but Sintich refused.  *Id.* at 41:9–22.  Then Sintich punished him for complaining by making him load trailers and unload a fifty-three-foot trailer every morning, before he could load his own truck for his Riverdale route.  *Id.* at 34:6–22, 42:8–15, 45:11–18.

---

[10]     Englewood, Roseland, and South Shore are predominantly Black areas.  *See* Azor Dep. at 46:19–23;  Cummings Dep. at 29:8–18.  John Ellis describes the Gresham neighborhood as predominantly Black. Ellis Dep. at 16:5–9.  Derwin Brown states that Englewood and Roseland are higher-crime areas.  Brown Dep. at 30:20–31:5.

Alonzo Studstill drove a route through Englewood and Roseland sometime between 2006 and 2008.  Def.'s Ex. 74, Studstill Dep. ("Studstill Dep.") at 179:7–10, ECF No. 366-4.  He requested to be reassigned from that route for two years straight, but his supervisor told him it was more feasible for him to work those inner-city Black neighborhoods than white drivers, and more feasible for white drivers to work in the white neighborhoods.  *Id.* at 179:7–180:20.  Colella also permitted white drivers to leave early, but when Studstill left early, Colella gave him a written warning.  *Id.* at 190:15–193:6.

Jamaine Young was frequently assigned to the Roseland route and sometimes drove the Englewood route in late 2007.  Def.'s Ex. 86, Young Dep. ("Young Dep.") at 64:21–22, 83:8–5, 87:6–88:10; 89:23–90:3, 95:1–96:17.  He requested other routes, but they were denied.  *Id.*  Young observed that supervisors did not assign a white driver to those routes.  *Id.* at 87:6–88:10.  In addition, Young says he was rarely assigned to routes in white suburbs like Orland Park or Frankfort.  *Id.* at 88:3–10.

William Smith drove a route through Roseland at some point between 2000 and 2008. Def.'s Ex. 70, W. Smith Dep. ("W. Smith Dep.") at 75:21–76:6, ECF No. 366-4.  While on his route, he heard gunfire from time to time, witnessed street fights, and, on two occasions, observed dead bodies in the street.  *Id.* at 80:16–81:7–23.  When Smith asked Szajkovics for a safer route, Szajkovics declined and stated that Blacks were familiar with the South Side of Chicago and that there were no open routes.  *Id.* at 76:22–77:14; *see* PSOAF ¶ 31(e).[11]

---

[11]     Alma Bonslater-Burnett disputes that familiarity with an area controlled the assignment of routes. When she asked Sintich to be assigned to a route with which she was familiar because she had driven the route previously on several occasions and because she lived in the area, Sintich instead assigned the route to a white driver who had never driven the route before but who lived in the area.  Def.'s Ex. 6, Bonslater-Burnett Dep. ("Bonslater-Burnett Dep.") at 71:18–74:3, ECF No. 366-1 (stating this occurred from 2005–2006).  When she reminded Sintich that she lived in the area, too, Sintich turned his back and walked away. *Id.*; *see also* Long Decl. ¶ 4(b) (JOT supervisor stating that open route assignments at JOT were often given out to white drivers prior to the route assignment being posted).

Smith also states that supervisors did not consider seniority when assigning routes. W. Smith Dep. at 79:21–80:1. Smith noticed that new white employees were assigned safer routes, and the supervisors claimed that the white drivers were more familiar with those routes. *Id.* at 84:3–18. But Smith felt capable of mastering any assigned route. *Id.* When Smith was finally assigned to a new route, it was the South Shore route, and while driving there, he witnessed a robbery at gunpoint and a lot of street fighting. *Id.* at 57:21–58:13. After a few months on that route, Smith asked Sintich for a safer route, but Sintich just transferred him back to the Roseland route. *Id.* at 55:1–56:5.

Angela Perry was assigned to the Roseland route by Szajkovics. Def.'s Ex. 55, Perry Dep. ("Perry Dep.") at 64:3–69:22, ECF No. 366-3. Perry complained to Pehlke, Sintich, and Szajkovics about all of the extra freight on the Roseland route, which often prevented her from completing her morning route until 9:00 p.m., after the afternoon shift had already left. *Id.* at 64:3–11, 68:14–69:19.[12]

Felicia Hill was also assigned to the heavy Roseland route when she worked afternoons at JOT in 2007. Def.'s Ex. 27, Hill Dep. ("Hill Dep.") at 52:5–10, ECF No. 366-2. She knew Roseland was a predominantly Black, higher-crime area, because her friend grew up there. *Id.* at 57:1–5. While driving the route, she saw people stealing bread off of a truck, sex workers standing on the street, and people hanging out of their cars. *Id.* at 57:6–23. She raised her safety concerns to her supervisors and asked for a different route; those requests were denied. *Id.* at 54:9–55:9.

---

[12]    Kenneth Briscoe also asserts that he was assigned a route that was significantly more demanding, but he provides no details about being assigned a significantly more demanding route at JOT. *See* Def.'s Ex. 8, Briscoe Dep. ("Briscoe Dep.") at 122:10–128:8, ECF No. 366-1 (discussing such a route at CHI, but omitting any specifics as to a heavy route at JOT). That said, Briscoe has described being assigned JOT routes in predominantly Black, higher-crime areas covering 67th to 95th and Englewood in Chicago, as well as Gary, Indiana, and a reasonable jury could find that he drove those routes during the relevant time frame. *See id.* 64:7–65:8, 76:16–77:9, 122:10–12.

Renard Singleton was assigned by Pehlke to a route in Hegewisch on the South Side of Chicago, which Singleton describes as a predominantly Black, high-crime area. Singleton Dep. at 37:14–16, 45:3–9. While driving the route in 2006 and 2007, a man approached Singleton at gunpoint and demanded money, and on another occasion, someone stole freight from his truck. *Id.* at 32:22–33:1, 37:1–6. When Singleton told Pehlke, as well as Sintich, that he felt unsafe in Hegewisch, they told him to start carrying a knife. *Id.* at 43:11–44:12. Pehlke added: "You're [B]lack, you can go to that area." *Id.* at 45:3–9. What is more, Singleton states that he heard Pehlke make racist comments and jokes once or twice a week and say "n*gger" two or three times a week in 2005 and 2006. *Id.* at 123:20–22, 128:7–18, 129:5–24, 129:15–130:21.

Pehlke delegated to Kirby Smart a route that ran from 87th to 55th Streets and from the Dan Ryan to Lake Michigan. Def.'s Ex. 67, Smart Dep. ("Smart Dep.") at 65:12–22, ECF No. 366-4. While Smart was at the back of his truck parked at 87th and Cottage Grove, someone jumped in his truck and drove off with all of the freight, as well as Smart's personal belongings. *Id.* at 66:8–69:23. At a different point in time, Szajkovics assigned Smart to a route in Gary, Indiana, even though he knew Smart was unfamiliar with the area and that Smart had complained the route was in a bad area. *Id.* at 80:81–4. Smart asked Szajkovics to be taken off of the route, but Szajkovics told him to do the route or he would be fired. *Id.* at 72:2–3, 76:10–17. By contrast, Smart noticed that white drivers often refused to go in dangerous neighborhoods and that they would not be assigned to those areas. *Id.* at 156:3–157:7. Instead, white drivers were assigned to less dangerous routes in Bridgeport, Tinley Park, Oak Lawn, and Chicago Ridge. *Id.* at 159:16–161:24.

Johann Haven observed that, when a driver was absent, supervisors would send a white driver to fill in on non-city routes and would send him to fill in on the city routes. Def.'s Ex. 25,

14

Haven Dep. ("Haven Dep.") at 125:7–129:10, ECF No. 366-2. As a result, Haven drove the South

Shore route and a route from 95th to 130th Streets and from the Lake to Stony Island Avenue once

or twice a week in 2005.[13] *Id.* at 78:10–80:11. He felt unsafe on both of these routes in higher-

crime areas. *Id.* He did not ask for another route, however, because he knew from experience that

"[w]orking at DHL wasn't an argument" and that any relief to be gained from complaining would

be temporary. *Id.* at 84:3–23, 131:17–132:6.

Anthony Jordan was driving a route that included Roseland, Altgeld Gardens, Jeffrey

Manor, and South Chicago, when a man approached him sometime between 2005 and 2007 and

asked what would happen if he knocked Jordan upside the head, locked him in the truck, and took

the items. Def.'s Ex. 37, Jordan Dep. ("Jordan Dep.") at 77:6–79:15, 84:17–85:23; 87:8–17, 88:3–

23, 98:9–14, ECF No. 366-2. Although the man did not carry out this threat, the incident

nonetheless made Jordan feel unsafe. *Id.* at 87:2–7. Jordan also was wary when he would see

groups of people standing on corners while making deliveries on his route. *Id.* He asked Sintich

and Szajkovics for the Homewood-Flossmoor route because it was less dangerous, but his requests

were denied. *Id.* at 89:19–90:17.

Like Jordan, Rickey Wetherspoon also drove a route through Altgeld Gardens, as well as

a route from 95th to 130th Streets and from South Halsted Street to the Lakefront after 2005.

Wetherspoon Dep. at 32:4–33:6. 36:6–13, 105:1–24, 109:20–110:1. In the summer of 2007 or

2008, he witnessed someone shoot the driver of the car in front of him five times. *Id.* at 109:20–

113:12. Wetherspoon asked Pehlke or another supervisor whether he could return to the station

because he was afraid for his safety, but was told to continue. *Id.* at 109:20–114:6. After Sintich

and Pehlke became aware of the incident, Wetherspoon asked them to be taken off of that route,

---

[13]     Haven also complains about driving the Englewood route in 2005, but he testified that he actually
wanted that route. *See* Haven Dep. at 70:16 ("I did want that route, yes.").

but he remained on the route until he was reassigned at a later point in time. *Id.* at 114:7–116:19, 140:15–141:11.[14] Wetherspoon explained that driving routes in predominantly Black, lower-income areas made his job more difficult, because the streets are not maintained, garbage is on the street, and vagrancy and loitering presented barriers to delivering packages to customers. *See id.* at 40:3–10 ("[Y]ou can barely get to your customer through asking people if you park there, if you can get through, excuse me.").

Joseph Jones drove morning routes that included Englewood and Roseland, as well as Gary, Indiana. Def.'s Ex. 35, J. Jones Dep. ("J. Jones Dep.") at 31:12–21, ECF No. 366-2. While he was driving his route in Gary, four men tried to snatch him from his truck for following their car too closely. *Id.* at 65:7–66:3. When he called Szajkovics to report it, Szajkovics laughed and told him that Jones could handle it and to continue on his route. *Id.* at 65:13–15, 68:12–69:1. After the incident, Jones continued to be assigned to the Gary route, and he knew that requesting another route was futile, because he would be sent home for refusing work. *Id.* at 69:22–70:10.

When Anthony McCall drove the Englewood route in 2005, he witnessed someone being shot and killed next to his van and saw four men trying to break into his truck. Def.'s Ex. 47, McCall Dep. ("McCall Dep.") at 91:6–23, 134:13–135:18, ECF No. 366-3. Based on these incidents, he told Pehlke that he wanted a less dangerous route. *Id.* at 85:12–86:21. In response, Pehlke asked him whether he wanted to work that day or not. *Id.* McCall also complained to Kogut that white drivers were ridiculing Black drivers for always being assigned to inner city

---

[14]     Although DHL points out that Wetherspoon stated that he preferred the city route because he knew the area best, there were some city routes that were in lower-crime areas, and Wetherspoon did not say which city route he was talking about. *See* Wetherspoon Dep. at 133:23–134:24. And while DHL states that Wetherspoon said he liked his route, he was speaking about his Homewood Flossmoor route. *Id.* at 81:1–82:1.

routes. *Id.* at 129:15–133:7. Kogut told McCall that he would discuss route assignments with the supervisors, but nothing ever changed. *Id.*

Like McCall, Willie Redd felt unsafe while regularly driving the Englewood route between 2005 and 2007. Def.'s Ex. 59, Redd Dep. ("Redd Dep.") at 42:7–15, 51:16–20, 52:14–18, ECF No. 366-3. He once saw a man who had been shot lying on the ground and witnessed drug dealing on a daily basis. *Id.* at 42:7–22, 52:6–53:8, 53:9–55:9. He asked Pehlke for a different route, but Pehlke said that nobody wanted that route and that Redd was doing a good job at it. *Id.* at 150:10–151:3. As a result, Redd was forced to "suck it up." *Id.*

David Fefee also saw a shooting while driving the Englewood route in 2006 and asked Pehlke for a different route. Fefee Dep. at 72:16–20, 75:4. He does not recall any white drivers being assigned to Englewood. *Id.* at 138:17–23. Pehlke reassigned Fefee to a route that was so difficult that DHL assigned three drivers to it when Fefee went on vacation. *Id.* at 77:20–80:17. Fefee asked for a different route, but never received one. *Id.* at 80:14–81:4. Fefee complained nearly every day to his supervisors that Black drivers were being assigned to routes in primarily Black, higher-crime neighborhoods, while white drivers were not. His supervisors were unreceptive to his concerns. *Id.* at 126:16–127:16, 135:11–136:3.

Edgar Medley also drove the Englewood route. Def.'s Ex. 50, Medley Dep. ("Medley Dep.") at 67:9, 88:15–89:3, 91:9–93:5, ECF No. 366-3. Pehlke himself admitted to Medley that Englewood was a "rough area" and that he would be scared to go to Englewood. *Id.* 58:12–59:14. Medley also overheard Pehlke explain to a Black driver that white guys were not assigned to the Englewood route because "you guys are tough." *Id.* at 67:9, 161:8–162:5; PSOAF ¶¶ 31(f), 49.[15]

---

[15]     Although DHL argues that Medley's statement lacks foundation because Medley assumes that Pehlke was referring to Black drivers, given the context, a reasonable jury could draw the inference that Pehlke was talking about Black drivers.

Medley states that, when Black drivers tried to refuse routes, the supervisors would ask them whether they were refusing work and reminded them that refusing work was a terminable offense. Medley Dep. at 154:22–155:8.  This did not happen to white drivers.  *Id.*

Sandra McNeely experienced firsthand what Medley describes.  A white driver named Tom Grogan refused to fill in for a vacationing Black driver on the Roseland route, a primarily Black neighborhood in Chicago, in 2005 or 2006.  McNeely Dep. at 55:12–57:24, 91:9–22, 131:4–22, 132:2–21.  Grogan said that he feared for his life.  *Id.*  After Grogan refused, Pehlke immediately ordered McNeely to take the route.  *Id.* at 57:10–24.  This made McNeely feel that Pehlke valued her life less than Grogan's.  *Id.* at 131:4–22.  Like Grogan, McNeely felt afraid driving through the predominantly Black, higher-crime areas on the route.  *Id.* at 58:3–59:5, 91:9–22, 129:15–19.  But when she complained to Pehlke, he asked her whether she was refusing work.  *Id.* at 107:14–17, 131:4–22; *see* PSOAF ¶ 31(d).

Alma Bonslater-Burnett reported to Matwij that she had heard gunshots near her truck and saw people running while she was driving her route at 65th Street and King Drive on the South Side of Chicago; Matwij just laughed.  Bonslater-Burnett Dep. at 79:7–22.  When she asked Matwij for another route, he denied her request without explanation.  *Id.* at 80:14–19.

Allan Kelly drove routes in the Roseland, Englewood, and Auburn Gresham neighborhoods.  Def.'s Ex 38, Kelly Dep. ("A. Kelly Dep.") at 7:23–8:14, 29:11–24, 30:16–18, 37: 15–38:12, 66:2–6, ECF No. 366-2.  He recalls feeling unsafe at night on the Auburn Gresham route, because he would see gang members hanging out in the streets, banging on his truck and hollering names, and blocking traffic so that he could not turn his truck around.  *Id.* at 40:9–15, 66:2–68:8, 69:6–9.  He reported these incidents, but was told to continue on the route.  *Id.* at 40:16–41:5, 66:20–67:2.

Michael Lowe felt unsafe on his route through Riverdale, Altgeld Gardens, Dolton, Calumet City, Harvey, and Markham. Def.'s Ex. 42, Lowe Dep. ("Lowe Dep.") at 37:7–12, 63:3–9, 67:5–17, 75:7–78:5, ECF No. 366-3. The route had forty to fifty stops per night in areas replete with gang violence, drug activity, and housing projects. *Id.* at 38:17–39:14, 44:18–20, 75:18–77:4.

Percy Fields recounts that Pehlke assigned him to help another driver on a route on the Southeast Side of Chicago, because white drivers did not want to drive in that area. Fields Dep. at 76:20–77:3, 102:23–103:2. He complained to Pehlke, but nothing changed. *Id.* at 103:6–104:7.

Alan Robertson noticed that supervisors assigned him and other Black drivers to routes in unsafe neighborhoods between 2004 and 2009. Def.'s Ex. 60, Robertson Dep. ("Robertson Dep.") at 16:16–19, 45:17–46:11, 56:21–59:24, 62:6–65:18, 129:11–25, 142:8–17, ECF No. 366-4. When Robertson complained about the discrimination, Szajkovics said, "Well, that's your people," *id.* at 142:8–16. Szajkovics went on to explain that Robertson was assigned to a route in a predominantly Black area, because he could "interact with them better," *id.* at 132:25–134:1.

From 2005 to 2008, Maxwell Akenton observed that Black drivers at JOT were assigned routes in higher-crime areas. Def.'s Ex. 1, Akenton Dep. ("Akenton Dep.") at 98:5–13, ECF No. 366-1. During that timeframe, Akenton was assaulted by someone with a gun when delivering in Gary, Indiana. *Id.* at 105:19–106:10. In addition, a supervisor referred to Akenton as "the African with the bone in his nose," which made him feel extremely uncomfortable. *Id.* at 112:14–21. He complained to the supervisor about being assigned to unsafe routes and stated that he believed route assignments were based on race, but the supervisor denied it. *Id.* at 86:13–21, 87:8–12.

Loron Stewart also drove the Gary route, as well as routes on the South Side of Chicago, Englewood, and Roseland, at Pehlke's direction. Def.'s Ex. 72, L. Stewart Dep. ("L. Stewart Dep.") at 82:5–83:4, 87:1–3, 93:17–19, 99:23–100:21, ECF No. 366-4. Stewart felt unsafe on

these routes. *Id.* at 97:10–98:8, 99:19–100:23. For example, on numerous occasions, people would run up to his truck or throw rocks and eggs at his truck. *Id.* When he complained to Pehlke that his routes assignments were dangerous and had too many stops and that he was only assigned the routes because he was Black, Pehlke refused to reassign him to a different route and responded that Stewart knew the areas (even though this was not always true). *Id.* at 94:7–95:12.

According to Charles Martin, approximately 75% of his routes were "heavy" routes (which require delivery of heavier packages with more stops) and 25% of his routes were in higher-crime neighborhoods, like Englewood, Altgeld Garden, Roseland, and Harvey. Def.'s Ex. 45, Martin Dep. ("Martin Dep.") at 44:6–16, 59:21–61:11, ECF No. 366-3. He complained about being assigned a heavy route and received no response. *Id.* at 59:21–60:2. According to Martin, Pehlke discipline drivers by giving them a heavy route or a route in a bad area. *Id.* at 85:22–86:13. On one occasion, Sintich called him in, offering him overtime for a route in a lower-crime area, only to assign him to a route in a primarily Black, higher-crime area, because a white driver was afraid of the route. *Id.* at 45:12–46:7. Martin complained to Sintich that he was tired of supervisors discriminating against Black drivers by putting them in bad areas and white drivers in good areas. *Id.* Sintich sat in silence and then denied that it was happening. *Id.*

Benita Green-Riley was assigned routes in Ford Heights and Chicago Heights. When she drove those routes, people threw soda cups and frozen oranges and apples at her truck. Green-Riley Dep. at 53:17–56:10. After dark, she would deliver only to businesses, because she was too afraid to make deliveries in residential areas. *Id.* She complained about her routes to Sintich and Guerrero, who told her, "That's all we have. If you don't like it, go home." *Id.* at 109:23–110:16.

According to Sintich, if a Black driver complained about a route, "there was really no discussion . . . . [T]hey were going to do it." Sintich Dep. at 19:20–20:6. Sintich explained that

20

"they were the best person for that route . . . . [because] they had route knowledge." *Id.* at 20:6–9.

### c. EEOC Expert's Analysis of JOT Routes

EEOC's expert, Dr. Thomas DiPrete, analyzed seven characteristics of the stops made by Black and white DHL drivers while driving routes out of JOT, DPA, and ORD:

1) Black population as a percent of the neighborhood where each stop took place;

2) percent of the neighborhood population that was below the poverty line;

3) percent of the neighborhood that was non-White;

4) rate of violent crimes in the neighborhood;

5) rate of property crimes in the neighborhood;

6) whether the neighborhood was more than 50% Black; and

7) whether the neighborhood was more than 70% Black.

PSOAF ¶ 5; Def.'s Ex. 104, DiPrete Rep. ("DiPrete Report") at 1, ¶ 2, ECF No. 366-12. In addition to analyzing each stop individually, DiPrete averaged the data for all of the stops along a given route and analyzed whether they differed for Black and white drivers. PSOAF ¶ 6; DiPrete Report at 1, ¶ 2. After performing multiple regression analyses, DiPrete found that Black drivers at JOT were "more likely than white drivers to pick up or deliver packages in neighborhoods that were more [B]lack, more non-white, and with higher rates of violent and property crime." PSOAF ¶ 8.[16] DiPrete found that the disparity in route assignments at JOT was statistically significant to

---

[16] The Court previously granted DHL's motion to strike Plaintiff's Exhibit 7, DiPrete's Supplemental Declaration, ECF No. 369-2. *See* 7/19/18 Order, ECF No. 358. The Court asked the parties to file revised summary judgment submissions that reflected that ruling. Both sides failed to do so. In any event, DHL did not move to strike DiPrete's original report, and both sides' experts have relied on third-party crime statistical data from Location, Inc., data for which they jointly paid. Therefore, the Court has considered the opinions offered by the experts for both sides and deems any objection waived for the purposes of summary judgment.

more than eight standard deviations, indicating that the odds that the routes were assigned by chance were less than two in ten trillion. *Id.*[17]

### d.   Accounts of Racial Segregation on the JOT Dock

Drivers at JOT, DPA and ORD loaded freight onto skids or into containers or unloaded and sorted freight in the "hard" or "bulk" freight area of the dock. PSOAF ¶ 66; Allen Dep. at 91:7–11; Hill Dep. at 59:3–18. Some drivers refer to the hard freight area as "the pit." *See* Allen Dep. at 91:8–10; Hill Dep. at 59:3–18; *see also* PSOAF ¶ 66. Freight varies in weight from a pound up to one hundred and fifty pounds and includes awkwardly shaped items like bumpers or motors, in addition to boxes. PSOAF ¶ 68. For heavy items, employees could ask for assistance from a co-worker, but DHL did not provide machines to lift the freight. *Id.*

JC Johnson never saw a white driver unloading freight at JOT. JC Johnson Dep. at 94:4–7. When he repeatedly asked Pehlke why Black drivers were the only ones unloading freight in the pit, Pehlke replied, "Just act like you are picking cotton." *Id.* at 126:2–3. Pehlke once replied, "Well, you are just doing what you guys are good at. You are good laborers." *Id.* at 101:15–23. He also said, "Well, you know, you guys built this country on labor." *Id.* at 102:9–10. Finally, when Johnson indicated that he was taking Martin Luther King, Jr. Day off of work, a white driver named Kenny Kimmel responded, "We just need to kill four more civil rights leaders and you get the whole week off." *Id.* at 131:6–132:3. Kimmel said this in Pehlke's presence, and, when Johnson asked Pehlke whether he heard Kimmel, Pehlke said, "There JC goes again, he is about to start whining." *Id.* at 131:18–21. And when Johnson complained to Pehlke's supervisor, Kogut, that the dock assignments were racially discriminatory and about Pehlke's "picking cotton"

---

[17]    DHL also attacks DiPrete's analysis by pointing to evidence that white drivers occasionally were assigned to fill in on routes in predominantly Black neighborhoods. *See* DSOF ¶ 67. Such instances, however, do not wholly negate DiPrete's opinion that Black drivers were disproportionately assigned to such routes. *See* Resp. DSOF ¶ 67.

statement, Kogut told him to stop being a crybaby.  *Id.* at 126:14–15.  Even Johnson's union representative, Neil Messino, discouraged him from filing a grievance about discriminatory dock assignments.  *Id.* at 127:1–19.

Like JC Johnson, Calvin Allen only lifted freight and loaded containers in the pit, and he saw that everyone handling large packages in the pit was Black, while everyone sorting letters was white.  Allen Dep. at 90:1–93:3.  Similarly, Felicia Hill worked in the pit and did not recall ever seeing any white driver working in the pit.  Hill Dep. at 59:3–6.

### e.  Accounts of Discriminatory Dock Assignments at JOT[18]

---

[18]  The EEOC has omitted any JOT dock claim in the Claimant Chart for Philip Azor and Paul Gilbert Sr.  *See* EEOC Claimant Chart.  Therefore, the Court presumes that neither of these drivers are asserting a race discrimination claim based on their dock assignments at JOT.

Similarly, the EEOC has not offered facts to support a discrimination claim related to dock assignments at JOT on behalf of Maxwell Akenton, Alma Bonslater-Burnett, Derwin Brown, David Fefee, DeMarco Foster, Nicholas Green, Johann Haven, Erskine Miller, Angela Perry, Ryan Robinson, Sharon Robinson, Millicent Shields, William Smith, Ricky Wetherspoon, and Sandra Williams.  *See* EEOC Claimant Chart (citing Bonslater-Burnett Dep. at 162:17–163:12 (stating she injured her back on a route at JOT and omitting any description of race-based dock assignments)); *id.* (citing Brown Dep. at 95:1–111:24 (discussing dock work at DPA and ramp work at ORD and stating that dock work at JOT "wasn't that hard")); *id.* (citing Green Dep. at 100 (stating that he did not think the JOT dock assignments were based on race because everyone on the dock was Black and he did not see what white drivers were doing)); *id.* (citing Shields Dep. at 34–36, 94, 114–19, 150–51 (discussing dock assignments at ORD, not JOT)); Akenton Dep. at 107:17–108:6 (stating that white drivers were asked to perform heavy lifting and to handle hazardous materials); Fefee Dep. at 83:12–87:4 (omitting any factual description of race-based dock assignments at JOT); Foster Dep. at 99:8–11 (stating that he did not believe that dock assignments were based on race); Haven Dep. at 90:16–92:20 (stating both he and white driver without routes performed the same dock work); Miller Dep. at 122:2–126:14 (admitting that morning shift dock assignments were not race-based and stating that, during the afternoon shift, he only loaded trailers about twice a week); Perry Dep. 108:20–24 (stating that scanning letters and small boxes was the most frequent work she performed on the JOT dock); R. Robinson Dep. at 38:7–14 (stating that he worked at JOT "[a]bout 10 or 20 [times], maybe not even that much")); S. Robinson Dep. at 33:2–14 (stating that she only worked at JOT fewer than five times); W. Smith Dep. at 67:20–23 (responding "No" when asked whether he believes that he personally was given certain dock work assignments on the basis of his race at JOT); Wetherspoon Dep. at 127:21–129:11 (stating that drivers closer to the front of the belt, as well as most women, did not have to unload containers at JOT in the morning, without describing race-based dock assignments); S. Williams Dep. at 83:4–14 (stating that she scanned freight and letters, and only loaded freight for her route at JOT).

As to the statements of the remaining drivers describing their experiences and observations of discriminatory treatment at JOT, any objections by DHL to such statements create a genuine issue of material fact for trial.

### 1) Assignment of Work in JOT Pit as Punishment

As noted above, after John Scott complained about being shot at while driving his route, Sintich punished him by making him load trailers, unload a fifty-three-foot trailer, and scan and load freight onto his truck every day by a certain time. Scott Dep. at 38:13–43:10.[19]

### 2) JOT Drivers Who Worked the Morning Shift

According to Alan Robertson, who worked at JOT three mornings a week from 2004 to 2009, morning dock work includes unloading tractor trailer shipping containers, loading packages from containers onto a conveyer belt, and loading one's truck with packages to be delivered that day. Robertson Dep. at 7:1–7, 91:25–92:5, 111:9–19, 118:10–119:9. Robertson saw Black drivers regularly perform the physically demanding task of unloading containers, while white drivers would do it periodically or for up to a half hour, before loading their truck. *Id.* at 122:11–21, 144:24–145:2. When Black drivers asked supervisors why Black, but not white, drivers were required to unload the containers, supervisors told them to do as they were asked. *Id.* at 91:25–92:5, 118:10–119:9.

Like Robertson, Kenneth Briscoe was told to unload all of the tractor-trailers containers and sort all of the freight, before he was allowed to sort his own freight and load his truck. Briscoe Dep. at 82:12–22. Briscoe could not recall ever seeing white drivers do this. *Id.* at 71:5–72:5.

Each workday, Percy Fields spent an hour and a half unloading containers, bringing containers to straight trucks, and loading freight on the conveyer belt, before he could load his truck and go on his route. Fields Dep. at 116:10–24. According to Fields, there were particular

---

[19] According to Scott, he and other Black drivers were also required to completely unload containers each morning before loading their own trucks for routes, whereas supervisors allowed white drivers to just load their own trucks and leave the station. Scott Dep. at 46:3–6.

drivers, mainly white, who never unloaded freight. *Id.* at 117:13–17. Black drivers all got their turn, although there were a few who sometimes got away without unloading. *Id.* at 117:19–22.

Joseph Jones accounted the following:

> [T]he African-Americans, we all unloaded the tractor-trailers. We had to unload the C containers and set it up for everybody else. Then you unload the letters. Then they want to put us on the boxes. That's the heaviest part of the work. And we had to unload the boxes, put them on the belt, to make sure they sat on the belt right. And they got [white] people just standing there . . . watching.

J. Jones Dep. at 87:14–89:23 (adding that he worked at JOT from 2005 to 2008). According to Jones, during the morning shift, white drivers rarely unloaded tractor-trailers, whereas he performed that task three times per week. *Id.* at 89:24–90:9. He stated that there might be two white drivers, and eighteen Black drivers, unloading containers. *Id.* at 96:13–22. By contrast, four people sorted letters every day, of whom only one might have been Black. *Id.* at 92:5–93:7. Jones asked twice a month to sort letters, but he was only permitted to do so once or twice in three years. *Id.* at 42:11–16, 90:19–91:13, 95:23–24.

In 2005 and 2006, Gregory Stewart was assigned to unload freight from containers and trucks onto the conveyor belt most every day, before loading his own truck to start his route. Stewart Dep. at 97:1–17. Stewart asked Sintich, his supervisor, why he and other Black drivers were assigned to unload freight all of the time, whereas white drivers were not. *Id.* at 98:3–21. Stewart got to sort letters once or twice a week, and only when the volume was high. *Id.* at 83:21–84:6.

Benita Green-Riley loaded trucks, sorted freight, shrink-wrapped skids, scanned freight, ran the conveyer belt, and searched for packages before and after completing her routes on the morning shift. Green-Riley Dep. at 100:2–101:19. She rarely worked with a white driver on the dock. *Id.* at 104:6–9. If there was a white driver on the dock, they performed letter sorting at a

desk. *Id.* at 106:1–5. She does not recall a single Black driver ever sorting letters, and if a Black driver was allowed to sort letters, it was a rare occasion. *Id.* at 106:6–13.

Sharee Washington was assigned by Szajkovics to perform what she describes as "back-breaking" jobs on the dock. Def.'s Ex. 79, Washington Dep. at 139:18–140:20, ECF No. 366-4. She unloaded trucks, set up the dock, carried and lifted packages onto the conveyor belt, and scanned packages. *Id.* at 58:1–61:20, 64:11–19, 66:5–67:9, 68:24–70:8. She scanned letters no more than ten times. *Id.* at 58:11–22. According to Washington, both Black and white drivers had to perform all aspects of dock work at one point or another, but she noticed that supervisors ignored white drivers, who were talking and sitting in the supervisors' office, standing around, or otherwise not doing work, while assigning additional work to Black drivers. *Id.* at 71:12–15, 137:12–138:5. Corroborating her account, Edgar Medley observed that, when white driver Jim May worked on international freight, he would come and talk to employees working on hard freight, but he was not required to load freight. Medley Dep. at 78:14–83:22. By contrast, when Washington filled in for May handling international freight, she was sent over to help with hard freight after she completed her work. *Id.*

Kirby Smart also saw primarily Black drivers unloading containers at JOT during the morning shifts in 2005 and 2006. PSOAF ¶ 93(b), (c); Smart Dep. at 91:23–92:4, 110:17–111:1, 114:6–16, 145:1–146:6, 150:2–14. As a result, Black drivers were unable to prepare their own trucks until after the containers were unloaded, causing delays. Smart Dep. at 146:14–19. Because they did not have to unload containers, white drivers did not suffer from this problem. *Id.* And, when Black drivers tried to perform the less physically demanding task of sorting and scanning letters, their supervisors told them that they had to unload containers. *Id.* at 91:23–92:4, 144:11–145:8, 150:2–23, 152:8–21.

Willie Redd too saw Pehlke order Black drivers at JOT to unload containers at the start of every morning shift from 2005 to 2007.  Redd Dep. at 22:13–18, 57:6–59:17, 60:20–63:10; PSOAF ¶ 90(nn).  According to Redd, this was considered "bottom of the barrel" work because it required a driver to lift dozens and dozens of boxes, in addition to loading boxes into their own trucks to prepare for their routes.  Redd Dep. at 138:12–22.  Occasionally, he would observe white drivers unload freight for five to fifteen minutes until they objected, at which point Pehlke reassigned them to less demanding work.  *Id.* at 61:22–62:12.  The only time Redd was allowed to sort letters was after the containers had been unloaded and white drivers stopped sorting letters to load their own trucks.  *Id.* at 66:18–23.

Renard Singleton, who worked on the JOT dock until 2010, had a similar experience.  On most days, Singleton had to unload containers for two hours before he was able to sort and load freight for his route.  Singleton Dep. at 82:8–20, 88:16–90:16.[20]  He complained to Pehlke, but Pehlke would ask him if he was refusing work.  *Id.* at 88:16–90:16.  As noted, Singleton heard Pehlke make racist comments and jokes once or twice a week and say "n*gger" twice or three times a week sometime in 2005 and 2006.  *Id.* at 123:20–22, 128:7–18, 129:5–24, 129:15–130:21.  Other than two white drivers, every other driver Singleton saw working in the pit was Black.  *Id.* at 97:11–99:22.

Charles Martin too was forced to unload containers in the morning with other mostly Black drivers.  Martin Dep. at 91:18–21, 97:11–12.  Only after doing so was he allowed to load his own truck, and he sorted letters only 10% of the time.  *Id.* at 93:10–95:15.  Martin complained to Sintich, Pehlke, and Szajkovics about the discriminatory dock assignments, but the supervisors denied it.  *Id.* at 99:20–101:22.

---

[20]     By comparison, Singleton was assigned to sort letters twice a month, and when he did, it was with three white drivers; he did not see any other Black driver sort letters.  Singleton Dep. at 83:20–84:24.

Jerry Thornton had to unload containers on most days between late 2005 and the termination of his employment in 2008. Thornton Dep. at 18:1–2, 26:13–16, 77:18–83:19. He complained to Szajkovics and Sintich about the unfair allocation of work, but nothing changed. *Id.* at 79:18–81:4. Thornton rarely sorted and scanned letters, and when he did, he was replaced by white drivers once they had returned from their routes. *Id.* at 83:4–12.

After completing his morning routes, Loron Stewart had to unload and load containers and trucks in the pit. L. Stewart Dep. at 102:2–18, 104:23–105:1. He often complained that he and other minority drivers were assigned to these tasks every day, while white drivers only had to unloaded containers infrequently. *Id.* at 52:4–55:20, 102:2–103:14, 104:19–107:19. Although Stewart asked to sort letters, he was only allowed to do so a handful of times because, according to his supervisors, he was "good at" unloading trucks and filling containers. *Id.* at 104:19–106:17.

Anthony McCall primarily worked the morning shift on the JOT dock from 2005 to 2008. McCall Dep. at 109:2–12. His job consisted of carrying boxes from the conveyor belt and moving them into containers or trucks; he never sorted letters. *Id.* at 46:6–13, 96:3–97:4, 105:10–13, 107:1–19, 108:17–109:14; PSOAF ¶ 90(ee). McCall recalls that five white male drivers and two Black male drivers sorted letters. McCall Dep. at 105:17–106:15. But most Black drivers were assigned to load trucks or unload boxes from the conveyor belt. *Id.* at 105:19–23.

Antonio Noys's job was to carry heavy freight from the conveyor belt and loaded it onto trucks; he worked with three other Black drivers. Def.'s Ex. 53, Noys Dep. at 22:3–5, 33:10–17, 37:5–39:1, 47:1–8, 73:24–74:10, ECF No. 366-3. He asked his supervisors twice a week to be assigned work that did not require heavy lifting, like sorting letters, but they denied his requests. *Id.* at 40:10–42:20. According to Noys, the drivers who sorted letters were white. *Id.* at 42:12–20.

### 3)  JOT Drivers Who Worked The Afternoon Shift

Afternoon shift dock assignments included loading and unloading freight, scanning freight, sorting letters, and looking for packages. *See* Cummings Dep. at 47:4–15. Loading freight required lifting packages into a trailer or container or onto the conveyor belt. *Id.* Scanning freight involved scanning and positioning freight while it is on the belt. *Id.* at 49:12–51:6. Sorting letters consisted of scanning letters, putting them in a bag, closing the bag, and moving the bag into a clear cargo carrier. *Id.* at 51:7–52:5, 53:17–20 (describing doing letters as the "filet mignon job"). Drivers also were tasked with finding packages for customers who had come to the station to pick them up. *Id.* at 51:6–53:7.

Jamaine Young worked the afternoon shift, as well as the morning shift, in 2005, 2006, and 2007. Young Dep. at 64:21–22, 70:5–13, 72:20–75:23. During this period, his supervisors were Pehlke, Sintich, and Szajkovics, and his manager was Kogut. *Id.* at 79:20–80:11, 92:7–12, 93:15–94:9. When Young worked the afternoon shift, he noticed that supervisors followed Black drivers and broke up conversations that Black drivers had with one another; this did not happen to white drivers. *Id.* at 72:20–75:23, 127:12–130:17; PSOAF ¶ 113(d). Moreover, Young and other Black drivers were forced to work overtime to complete tasks that a white driver had refused to complete. Young Dep. at 123:21–127:11.

When Young worked the morning shift, he would set up the dock and unload any trucks that had already arrived. *Id.* at 90:22–92:5. Unlike most drivers, he unloaded freight non-stop, sometimes from 3:00 to 9:00 a.m. *Id.* at 91:2–92:5. He complained to his supervisors, but they did not provide any relief. *Id.* at 92:7–12, 93:15–94:9. Young was sometimes assigned to scan letters, but only when it was an "all hands on deck" situation that required everyone to help out. *Id.* at 93:5–12.

When Kirby Smart worked the afternoon shift, he mostly loaded freight. PSOAF ¶ 90(tt); Smart Dep. at 91:23–92:4, 93:22–95:2, 98:10–100:11, 106:14–109:15, 109:23–112:21, 111:2–12, 113:18–23. This often involved lifting and stacking freight to fill an entire trailer. *Id.* at 110:6–16. He noticed that white male drivers were allowed to sort letters, even though they had lower seniority. *Id.* at 109:2–16, 112:2–24, 150:2–23. Smart saw one white driver load freight once in a while, but Black drivers seldomly were allowed to sort letters. *Id.* at 150:2–5.

Kevin Cummings worked with three white drivers, but he was the only one required to work in the trailer loading and unloading freight, while the white drivers talked and pretended like they were doing something outside of the trailer. Cummings Dep. at 54:10–55:22, 57:15–17. Cummings complained to supervisors and managers frequently for help in the trailer, but nothing changed. *Id.* at 56:17–57:14. Cummings was assigned to scanned letters only when a white driver was absent. *Id.* at 53:12–20.

Like Cummings, Edgar Medley rarely sorted letters, although he repeatedly asked Colella and Ehrhart. Medley Dep. at 70:4–71:3, 73:23–75:5, 145:1–147:5, 160:3–13. On one occasion, Medley and other Black drivers started to scan letters to see what would happen. *Id.* at 74:1–3, 75:1–76:1. After a few minutes, Ehrhart and Matwij told them to go back to the hard freight area. *Id.* at 160:3–16. When Medley asked Kogut why they could not scan letters, Kogut asked him whether he was being grossly insubordinate. *Id.* at 145:1–147:5, 160:3–13, 166:13–19. The only time that Medley saw white drivers in the hard freight area was when they were there to talk to someone. *Id.* at 72:5–73:15, 78:1–80:16, 86:16–88:14. He never saw a white driver unload a full container. *Id.* at 103:7–104:5. According to him, Colella and Ehrhart allowed white drivers to loiter, while assigning additional work to Black drivers who did the same. *Id.* at 31:10–35:20, 47:4–8, 31:5–37:14, 147:6–149:2. And when Medley complained, the supervisors and managers

separated him from other employees and accompanied him on bathroom breaks. *Id.* at 186:19–188:14. Medley states that the majority of his complaints about race-based dock assignments were ignored. *Id.* at 79:18–81:1, 147:6–149:18, 161:8–162:5.[21]

Anthony Jordan worked in the hard freight area the majority of time in 2005 and 2006, whereas white drivers sorted letters. Jordan Dep. at 35:19–22, 38:13–18, 91:20–92:5, 126:15–127:2. Although he did see one white driver work hard freight regularly, he did so because he did not want to sort or scan letters. *Id.* at 38:16–18. Jordan sorted letters a couple of times a week until white drivers returned from their routes, and then he was sent to work on freight. *Id.* at 35:19–22, 91:20–92:5, 126:15–127:2. According to Jordan, Colella ignored white drivers who were just standing around, while assigning additional work to Black drivers who did so. *Id.* at 148:8–150:3; EEOC Ex. 12, Ex. 9 of Jordan Dep., Deeds Dep. at 26:19–27:9, ECF No. 369-2.[22]

Sandra McNeely rarely saw white drivers doing heavy dock work. McNeely Dep. at 91:23–92:8, 136:6–137:10. And, when she was allowed to sort letters, she was told to work on heavy freight once white drivers returned from their routes. McNeely Dep. at 91:23–93:2, 134:22–136:5 (stating the "white boys were . . . doing letters"); PSOAF ¶ 91(m). She rarely saw white drivers doing heavy dock work. McNeely Dep. at 91:23–92:8, 136:6–137:10.

Allan Kelly also witnessed white drivers replace Black drivers at the letter sorting area once they returned to the station. Kelly Dep. at 103:13–104:1. He very seldomly saw a white driver replace a Black driver loading, unloading, or sorting hard freight. *Id.* Kelly requested to

---

[21]    Lewis Reams also noticed that only he and other Black drivers loaded containers. Def.'s Ex. 58, Reams Dep. ("Reams Dep.") at 80:21–81:1, ECF No. 366-3. Although he did see at least one Black driver doing letters, *id.* at 81:2–6, Reams was never assigned to do so, *id.* at 77:13–14.

[22]    Although DHL points to Jordan's statement that, during the morning shift, everyone had to unload hard freight regardless of race, it is undisputed that Jordan worked the afternoon, not the morning, shift at JOT. *See* Jordan Dep. at 39:12–40:1, 146:3–11. This is enough to create a question of fact if it can be established that Jordan has personal knowledge of what occurred during the morning shift.

drive a forklift and sort letters, but supervisors assigned him to perform heavy dock work nearly every day. A. Kelly Dep. at 58:7–16, 70:9–71:10, 72:13–18, 88:9–89:11, 102:1–18. Black drivers primarily handled the heavier freight, while white drivers mostly scanned the freight and sorted letters. *Id.* at 89:4–11.

Michael Lowe was never allowed to sort letters while he worked at JOT in 2005 or 2006. Lowe Dep. at 78:20–22. Instead, he always was assigned to load freight onto the belt, load trucks, and scan freight. *Id.* at 81:2–5. He observed that nine out of ten drivers, who loaded freight onto the belt and into containers, were Black. *Id.* at 79:13–80:12. He also mostly saw white male drivers, and maybe two young, Black, female drivers, scanning letters. *Id.* at 79:5–12.

Aldrich McNeal loaded heavy freight every day while working at JOT in 2007. McNeal Dep. at 39:15–21, 67:6–68:12. Whenever he was able to sort letters, he would be replaced by a white driver when the driver returned from his route. *Id.* at 101:7–102:1. McNeal then would be assigned to heavy work and unloading trailers. *Id.* When he asked supervisor Colella for more assignments sorting letters, Colella asked him whether he was refusing a work order. *Id.* at 93:8–94:9; PSOAF ¶ 103(b). Colella also would refer to McNeal as "boy" and as "you people." McNeal Dep. at 135:14–137:15. McNeal complained to Kogut, manager Radcliffe, and regional manager Edell about Colella's conduct, but Colella's behavior never changed. *Id.* at 141:15–143:1.

When Oliver Dean was not driving a route, he was assigned to the pit with mostly Black drivers. Dean Dep. at 67:6–24. They unloaded trucks, scanned freight, and unloaded freight off of the conveyor belt. *Id.* Between 2005 and 2008, Dean did not see any Black drivers sorting letters, and he did not see any white drivers working in the pit. *Id.* at 100:7–24, 101:1–4 (adding that he saw only one Hispanic driver from time to time).

32

Reginald Bailey also worked in the pit at JOT in 2005. Bailey Dep. at 105:15–109:2. There, he observed mostly Black drivers perform the laborious jobs, like moving freight off of the conveyor belt, loading containers, and pushing them into trucks. *Id.* The majority of drivers scanning freight were white. *Id.* at 108:20–23.

Alonzo Studstill was assigned to heavy dock work every day during his afternoon shift. Studstill Dep. at 71:18–24, 75:18–76:1, 77:1–78:8, 119:4–6, 146:17–149:20. He, too, saw mostly Black drivers working in the pit, and whenever he saw white drivers there, they would be standing around, unassigned to any task. *Id.* at 153:2–21. When he was assigned to sorting letters, Studstill often was pulled to work in the pit or on international freight. *Id.* at 149:7–18. In July 2006, Studstill saw two white drivers leaning on a container, when Colella called Studstill, who was performing a task on the other side of the room, to come over and move the same container. *Id.* at 88:9–91:6. One of the white drivers offered to move the container, but Colella told Studstill, "I want you to move it." *Id.* The white driver moved the container anyways, whereupon Colella gave Studstill a written warning for not following directions. *Id.* at 88:9–14, 89:2–91:20. Colella often treated Studstill in this manner. *Id.* at 98:20–100:15, 80:7–11.

### 2.    DPA (Lisle)

As with JOT, the EEOC and the remaining intervenors assert that discriminatory route assignments, dock assignments, and racial segregation occurred at DPA from 2005 until the station was closed in 2009. *See* DSOF ¶ 2.

#### a.    DPA Supervisors and Routes

During the relevant time frame, Rick J. Oliverio supervised drivers during the morning shift, and Brian D. Berdis, Steven J. Brandt, Bill Brewster, Brian E. Bronson, and Jeff McGrath assigned routes and dock work on the afternoon shift. *See* Def.'s Ex. 97, Arends Decl. ("Arends

Decl.") ¶¶ 13–14, ECF No. 366-6; Brandt Dep. at 22:1–12, 145:24–146:9, 173:24–175:22; Def.'s

Ex. 19, Ford Dep. ("Ford Dep.") at 65:14–15, ECF No. 366-1; Def.'s Ex. 56, Price Dep. ("Price

Dep.") at 87:8–19, ECF No. 366-3; *see also* DHL's Answers Interrogs.  These supervisors reported

to manager Joseph P. Yates.  Brandt Dep. at 31:6–8; Def.'s Ex 96, Yates Dep. ("Yates Dep.") at

15:22–16:18, ECF No. 366-5; *see* DHL's Answers Interrogs.

      While operational, DPA serviced the following suburbs, listed by route:

| | |
|---|---|
| Aurora | Lisle |
| Batavia | Lockport |
| Bolingbrook | Lombard |
| Burr Ridge | Naperville |
| Carol Stream | North Aurora/Montgomery |
| Clarendon Hills | Oak Brook |
| Crest Hill | Plainfield |
| Darien | Romeoville |
| Downers Grove | St. Charles |
| Geneva | Villa Park |
| Glendale Heights | Warrenville |
| Glen Ellyn | West Chicago |
| Hinsdale | Westmont |
| Homer Glen | Wheaton |
| Joliet | Willow Brook |
| Lemont | Woodridge |

PSOAF ¶ 12.[23]

---

[23]     Drivers describe from their own observations and experiences that certain of these routes were in more non-white, higher-crime areas, including the eastern part of Aurora, parts of Bolingbrook, the eastern part of Joliet, and parts of Warrenville.  Def.'s Ex. 11, Buffkin Dep. ("Buffkin Dep.") at 40:15–21, 64:7–65:10, ECF No. 366-1 (east portion of Joliet); Price Dep. at 48:7–12, 61:7–19, 62:12–15 (east Aurora, parts of Bolingbrook, east Joliet, parts of Villa Park); R. Robinson Dep. at 46:19–49:4 (parts of Aurora), 120:10–121:6 (Aurora, Joliet, parts of Warrenville).

### b. Accounts of Discriminatory Route Assignments at DPA

Drivers claim that they were subject to discriminatory route assignments at DPA during the afternoon shift between 2005 and 2009. [24]  The following are examples of their accounts.[25]

According to Nathaniel Jackson, Brandt assigned Black drivers to the east side of Joliet and white drivers to the west side of Joliet.  Def.'s Ex. 31, N. Jackson Dep. ("N. Jackson Dep.") at 189:8–192:6, ECF No. 366-2.  The east side of Joliet was considered a higher-crime area, whereas the west side of Joliet was not.  *Id.* at 189:8–192:6.  When a Black driver asked why Black

---

[24]    The EEOC has omitted any DPA route claim in the Claimant Chart for the following drivers: Anthony Calhoun, Melvin Edwards, John Ellis, Jimmie Hayes, Lisa Huggins, Christopher Johnson, Robert Lyons, Lewis Reams, Renard Singleton, Paul Thomas, Randy Thompson, George White, Sandra Williams. *See* EEOC Claimant Chart.  Accordingly, the Court presumes that the EEOC and the remaining intervenors Melvin Edwards, John Ellis, and George White do not assert a discriminatory route assignment claim based on their tenure at DPA.

Furthermore, certain drivers who worked at DPA in the morning do not provide any facts to support a claim of discriminatory route assignments.  *See, e.g.*, Green-Riley Dep. at 47:7–10 (stating she had no route at DPA); Def.'s Ex. 28, Hopkins Dep. ("Hopkins Dep.") at 36:16–37:4, 40:1–17, 63:12–14, ECF No. 366-2 (merely describing Evanston route serviced by ORD); Def.'s Ex. 32, C. Johnson Dep. ("C. Johnson Dep.") (omitting morning DPA route claim); Perry Dep. at 50:3–13 (stating that she worked at DPA fewer than five times); Robertson Dep. at 129:11–130:4 (disavowing any DPA route claim); Singleton Dep. at 49:19–50:13, 53:24–54:4, 56:9–24, 65:9:15–17 (stating that he liked his morning routes at DPA).

Likewise, some drivers who worked at DPA in the afternoon have failed to provide any facts to support a discriminatory route assignment claim.  *See* Allen Dep. at 51:22–32:11 (stating that he occasionally filled in on a route at DPA); Briscoe Dep. at 85:3–8 (stating he drove only a few times at DPA); Brown Dep. at 106:2–18, 108:16–22 (admitting he had no route and stayed on the dock at DPA); Dean Dep. at 58:14–18 (stating he drove the Naperville route at DPA and omitting any related hardship); Green Dep. at 54:20–55:19 (saying he drove the Joliet route "not too often" and nothing ever happened that made him feel unsafe); Hill Dep. at 47:5–17 (admitting she liked her route at DPA and had no complaints); Def.'s Ex. 39, R. Kelly Dep. ("R. Kelly Dep.") at 52:21–53:5, ECF No. 366-2 (stating that DPA route was not unsafe and only sometimes heavy); Def.'s Ex. 40, Lester Dep. ("Lester Dep.") at 62:7–63:13, 65:22–24, ECF No. 366-2 (admitting she was happy driving her route in Woodridge, Darien, Downers Grove, and Westmont from 2005 to closing of DPA); Def.'s Ex. 43, Lyons Dep. ("Lyons Dep.") at 13:5–12, 37:4–15, 96:3–97:20, ECF No. 366-3 (saying he does not believe he was sent to any unsafe areas based on his race); Def.'s Ex. 46, May Dep. ("May Dep.") at 34:18–35:20, ECF No. 366-3 (stating that he worked at DPA prior to 2004, *i.e.*, outside the relevant time period); S. Robinson Dep. at 55:22–56:22 (admitting she liked her permanent Oakbrook route at DPA).

[25]    The Court notes that, to the extent that DHL disputes any of these drivers' descriptions of their observations and experiences, this creates a genuine issue of material fact for trial.

drivers are assigned to such neighborhoods, Brandt said that it was because Black drivers can easily "get in and get out and you pretty much know the area." *Id.* at 192:23–193:21. After Jackson finished a single shift driving the east Joliet route, he asked Brandt for a different route, citing the route's higher crime and his unfamiliarity with the route, to which Brandt responded, "You'll be okay," and denied the request. *Id.* at 137:19–139:21; PSOAF ¶ 33(b).

Shuray Buffkin repeatedly asked Brandt not to be assigned to the east side of Joliet route because it was dangerous and he was unfamiliar with the area. Buffkin Dep. at 64:7–65:10; PSOAF ¶ 33(a).[26] In response, Brandt publicly mocked Buffkin and used purported Black slang language, dialect, and mannerisms. Buffkin Dep. at 64:20–66:3.

Michael Johnson was assigned the Aurora route by Brandt. But, Johnson did not feel safe driving the route at night, because he had been approached by gang members on several prior occasions. PSOAF ¶ 27(m); M. Johnson Dep. at 67:14–70:18. According to Johnson, only one white driver was assigned to the Aurora route and only during the daytime. *Id.* at 81:3–82:9. Johnson heard Brandt tell a Black driver named Kamali Ali by saying, "I got to get all the white guys first, and then I'll get to you." *Id.* at 99:1–100:6. In addition, Johnson saw Brandt mock Ronnie Ford every night, using exaggerated Black dialect and mannerisms, such as "jive walking" with his arms and legs flailing. *Id.* at 115:22–117:5. But Johnson never saw or heard Brandt treat white drivers in this manner. *Id.* at 117:6–8. And in 2007, another supervisor, Jeff McGrath, called Johnson and a group of Black drivers "a bunch of lazy n\*ggers."[27] *Id.* at 137:22–138:7, 139:24–141:23.

---

[26]    During his deposition, Buffkin explained that there was a predominantly Black, higher-crime area in Joliet called "The Hill" where shootings took place. *Id.* at 40:15–21.

[27]    One of the drivers reported McGrath for this, and McGrath was suspended for a week and received training. *Id.* at 140:22–142:15.

Ronnie Ford confirms Johnson's account that Brandt consistently mocked him and other Black drivers using racial stereotypes, even in the presence of other supervisors. Ford Dep. at 110:15–19, 112:10–13, 113:4–7. From 2007 to 2008, Brandt assigned Ford to a heavy route that included an unsafe area with gang graffiti and people loitering outdoors at night. *Id.* at 88:12–14, 88:22–89:23, 93:6–12. Ford asked for another route, but nothing changed. *Id.* at 90:2–12.[28]

Paul Gilbert also drove a route with a lot of heavy freight, including some parcels that weighed between 150 to 300 pounds. Gilbert Dep. at 18:3–19:18, 20:10–24. Gilbert complained that, when Brandt had previously assigned the same route to a white driver, Brandt also assigned a white helper. *Id.* at 19:19–20:9, 21:15–23. But Brandt denied Gilbert's request for a helper and told him that if he could not handle it, he would be written up. *Id.* at 20:8–9, 21:1–4. Gilbert drove that route without a helper for eight months until operations at DPA ended. *Id.* at 22:3–9.

DeMario Jackson frequently drove a route in Glendale Heights prior to 2006. Def.'s Ex. 30, D. Jackson Dep. ("D. Jackson Dep.") at 78:1–5, 85:10–86:12, ECF No. 366-2. When a white driver had the route prior to Jackson, the freight that was already on skids so that it could be easily loaded into the truck. *Id.* at 82:14–19. But, when Jackson took over the route, he was required to sort the freight, load them onto skids, wrap the skids, load the freight into the truck, bring it back, and handle the freight again. *Id.* at 82:20–23. Although Jackson complained every day to his supervisor that the arduous demands of the route required two people, he never received assistance. *Id.* at 76:3–9.

Michael Johnson describes that whenever he punched in late to work or took a day off of work, Brandt would assign him to a route that required more strenuous work. Def.'s Ex. 34, Def.'s Ex. 34, M. Johnson Dep. ("M. Johnson Dep.") at 49:19–50:22, ECF No. 366-2. One example was

---

[28]     DHL cites lines 58:6–10 of Ford's deposition to argue that Ford liked his routes. This is incorrect. Ford said he liked the location of DPA, not his routes.

the Glendale Heights route that required stacking heavy boxes onto skids, wrapping skids, and loading them onto the truck to drive back to DPA. *Id.*

When Timothy Price worked the afternoon shift between 2005 and 2009, he was taken off of a Carol Stream route he had driven for a year and placed on a new route in Aurora. Price Dep. at 87:8–9, 90:1–5. Price complained to Brandt that he felt unsafe on the Aurora route and saw a lot of gang members hanging around in areas where he picked up packages, but Brandt responded that Price could handle it. *Id.* at 104:9–18. Price also complained to manager Yates that he did not want the Aurora route due to safety concerns, to no avail. *Id.* at 101:7–11, 102:1–2, 103:8–9.

According to Ryan Robinson, from 2005 until 2008, when white drivers refused to drive through the higher-crime areas of Aurora, Brandt and other supervisors assigned Black drivers to cover those areas. R. Robinson Dep. at 48:7–49:7. Robinson also observed that supervisors assigned more difficult industrial-park routes to Black drivers, not white drivers. *Id.* at 58:5–8; 61:1–7. Of his industrial park routes, 80% were heavy routes, with freight up to 200 pounds, and he was never given a dolly or forklift. *Id.* at 58:3–59:20. Robinson estimates that about 60% of his routes at DPA were to industrial parks, and 40% were in higher-crime areas. *Id.* at 48:7–49:4, 51:3–9.

### c.    EEOC Expert's Analysis of DPA Routes

Dr. DiPrete also conducted multiple regression analyses of route assignments at DPA to determine whether Black drivers were more likely than white drivers to drive routes in predominantly Black areas and routes that were more difficult and more dangerous. PSOAF ¶ 4. The parties agree that DiPrete's analysis using ZIP code data indicated little to no statistically significant differences in the racial, poverty, or crime characteristics of the routes driven to by Black and white drivers. DSOF ¶ 17. But his analysis using 2010 Census Tracts data does show

that Black drivers were significantly more likely than white drivers to deliver or pick up packages in areas that had a higher percent of Black residents, poor residents, and non-white residents, and that the neighborhoods where Black drivers delivered packages had a higher average rate of crime. Resp. DSOF ¶ 17; *id.* ¶ 8. In addition, DiPrete concluded that Black drivers were more likely than white drivers to pick up or deliver packages in neighborhoods that were more than 70% Black. *Id.* In his view, these differences were statistically significant to more than two standard deviations, and, thus, were unlikely to have been caused by chance. *Id.*

According to DHL's expert Dr. James Langenfeld, less than 1% of route assignments at DPA between 2005 and 2008 involved an area that had a majority of Black residents and poorer residents, and in 2009, that number was only 4.3% of all routes. DSOF ¶ 18. The EEOC counters that Dr. Langenfeld has misinterpreted Dr. DiPrete's results in that Dr. DiPrete took an average measurement of characteristics along any particular route, and, thus, even though the average of all stops might not have reached the 50% Black threshold, it is possible that individual stops along that same route were in majority Black neighborhoods. *See* Resp. DSOF ¶ 18.

### d. Accounts of Racial Segregation on the DPA Dock

Nicholas Green recounted the obvious racial segregation on the dock during the afternoon shift.

> You would see a whole line of people one color and the other line of people of a different color. And the ones over here could talk, could scan the little stuff, had the radio playing; but the ones over here get the heavy stuff, get punished, can't talk, can't listen to any music. And, you know, that doesn't make for a good workplace at all, not at all.

Green Dep. at 102:10–102:23; *see id.* at 36:13–17 (stating he started at DPA in 2007); *id.* at 22:4–10 (stating he worked at DPA until August 2008).

Timothy Price lodged a complaint about racial segregation at DPA on DHL's hotline in 2006, but nothing changed. Price Dep. at 74:19–77:24. In fact, after he complained, Berdis terminated him; although he grieved his termination and got his job back, he lost pay and benefits during the time he was terminated. *Id.*

When Lewis Reams loaded heavy boxes onto pallets in the pit during the afternoon shift, every driver in the pit was Black. Reams Dep. at 66:11–67:15, 68:15–20, 69:7–20; *see* Def.'s Resp. PSOAF ¶ 90(mm), ECF No. 374. Reams was not assigned to drive a forklift, scan freight, or sort letters. Reams Dep. at 66:19–67:24. Reams envied others who were able to do something other than work in the pit, but the dock was strictly segregated. *Id.* at 68:5–9.

Paul Thomas recalls a time when he was loading freight in the pit during an afternoon shift, while Brandt and some white drivers were playing baseball using a ball made out of shrink wrap. Def.'s Ex. 75, Thomas Dep. ("Thomas Dep.") at 120:1–122:21, 275:21–276:19, 280:18–282:18, ECF No. 366-4. When Thomas asked Brandt why the white drivers were not working, Brandt told him to get back to work. *Id*. at 281:20–22.

### e. Accounts of Discriminatory Dock Assignments During the Afternoon Shift at DPA[29]

---

[29] Drivers who worked the morning shift at DPA have not provided any facts to support their claims that they were subject to discriminatory dock assignments. For example, Benita Green-Riley recalls that, when she worked at DPA in the morning, there were not many Black drivers and that the white and Black drivers did the same things. Green-Riley Dep. at 105:14–24. Renard Singleton recalls that he did not do much dock work in the mornings at DPA and that the dock assignments "seemed to be more equal." Singleton Dep. at 91:23–92:4. Specifically, Singleton states that he performed "quite a bit" of letter sorting two or three times a week, recycled freight once per month with white and Black drivers, did not unload trucks that much, and when he did, he unloaded trucks with white drivers and one other Black driver. *Id.* at 92:5–94:4. In addition, although Philip Hopkins asserts he was subjected to discriminatory dock assignments in the mornings at DPA, he does not describe any disparate treatment and, instead, states that he might be thinking of the time when he worked at DPA during 1998 or 1999. Hopkins Dep. at 37:21–38:1, 61:8–63:11. Similarly, Allan Robertson admits that, although Plaintiffs' discriminatory dock assignment claims regarding the morning shift at DPA are based on disparate treatment between 2005 and 2009, he worked mornings at DPA from 1995 to 1996. Robertson Dep. at 46:1–2; PSOAF ¶ 4.

There is evidence in the record of discriminatory dock assignments during the afternoon shifts at DPA.[30]  First of all, heavy dock work was often used as a punishment.  For instance, Ryan Robinson observed that if Brandt did not like a driver, he would assign the driver dock work that involved heavy lifting as punishment.  R. Robinson Dep. at 101:22–24.  Similarly, Michael Johnson states that, if he missed a day of work, he would be punished by being assigned to work in the pit when he returned.  M. Johnson Dep. at 38:2–4.

When Calvin Allen, Shuray Buffkin, Anthony Calhoun, and Oliver Dean worked the afternoon shift at DPA, they and other Black drivers were primarily assigned to perform heavy dock work, and they never saw any white drivers doing heavy dock work.  Allen Dep. at 87:6–23, 91:3–23; Buffkin Dep. at 79:5–14; Def.'s Ex. 12, Calhoun Dep. ("Calhoun Dep.") at 124:18– 125:10, 127:10–128:8, ECF No. 366-1 (discussing 2005); Dean Dep. at 100:7–17 (stating that only

---

[30]      The EEOC has specifically omitted any DPA dock claim in the Claimant Chart for Paul Gilbert Sr. *See* EEOC Claimant Chart.  As such, the Court presumes that the EEOC is not asserting a race discrimination claim based on Gilbert's dock assignments at DPA.

Neither the EEOC, on behalf of Melvin Edwards, Benita Green-Riley, Felicia Hill, Philip Hopkins, Nathaniel Jackson, Miranda Lester, Angela Perry, Allan Robertson, and Renard Singleton, nor any remaining intervenor has presented any facts to support the contention that these drivers experienced discriminatory dock assignment claims at DPA.  *See* Def.'s Ex. 15, Edwards Dep. ("Edwards Dep.") at 127:8–9, ECF No. 366-1 (stating he only worked at DPA for one week); Green-Riley Dep. at 104:14–24 (stating that white drivers did the same things Black drivers); Hill Dep. at 36:12–44:1 (stating that she mostly scanned packages on the belt, she worked with two Black drivers and one white driver and sometimes two white drivers, and she saw Black drivers sorting letters); Hopkins Dep. at 37:21–38:1, 61:8– 63:11 (omitting any factual description of DPA dock assignments and stating that he cannot recall when he worked at DPA and may be confusing working at DPA during 1998 or 1999, outside of the relevant time period); N. Jackson Dep. at 147:1–10 (stating he worked in the pit for maybe a second or two and was switched to scanning letters); Lester Dep. at 67:9–68:10, 69:16–19 (stating she mostly scanned letters and there was no other dock work that she would have preferred over scanning letters); Perry Dep. at 122:1–19 (stating she cannot recall with any specificity why she believes she was treated unfairly based on race at DPA and ORD); Robertson Dep. at 46:1–11 (stating that he worked at DPA from 1995–96, outside of the relevant period); Singleton Dep. at 91:23–92:4, 92:21–94:4 (stating DPA dock assignments "seemed to be more equal," sorted letters most frequently of all assigned work, helped unload trucks with white drivers and one Black driver).

The Court notes that, to the extent that DHL disputes any of the remaining drivers' descriptions of their observations and experiences, this simply creates a genuine issue of material fact for trial.

one Hispanic driver would occasionally work in the pit). Dean adds that he did not see any Black drivers assigned to do light dock work from 2005 to 2008. Dean Dep. at 103:5–9.

John Ellis, who worked the afternoon shift from 2006 to 2008, complained to Brandt on a daily basis, asking him why Black drivers performed the heavy work, while white drivers sorted letters. Ellis Dep. at 50:19–51:12.[31] Brandt replied, "It's that way because that's the way I want it." *Id.* at 51:11–15.

Kenneth Briscoe, who worked at DPA after 2006, loaded containers, pallets, and skids the majority of every day, and never sorted letters. Briscoe Dep. at 63:8–64:6, 83:18–84:15, 121:19–21. When another supervisor assigned Briscoe to work outside of the pit, Brandt reassigned him back to the pit after a few days. *Id*. at 85:1–15.

As described earlier, Brandt regularly mocked Ronnie Ford and other Black drivers using racial stereotypes, even in the presence of other supervisors, whereas he did not make fun of white drivers. Ford Dep. at 110:15–19, 112:10–13, 113:4–7. Brandt also reassigned Ford's ramp duties to a white driver, which meant that Ford had to work in the pit the entire time when he returned from his route. *Id.* at 62:6–12. In the pit, Ford loaded containers with heavy freight, stacked skids, and sorted freight with other Black drivers. *Id.* at 46:15–23.

According to Ryan Robinson, Brandt would mock rap, wear a ski mask, and act in a derogatory manner toward Black drivers every day. R. Robinson Dep. at 121:21–122:4. Brandt received a lot of complaints on a weekly basis from all of the Black drivers, but there was no improvement. *Id.* at 126:17–21. At a daily safety meeting, after Paul Thomas complained about his dock assignment, Robinson saw Brandt give Thomas a banana, call him a monkey, and say, "I

---

[31]     DHL unsuccessfully attempts to support its position that Black drivers and white drivers worked side by side in the pit by pointing to Ellis's statement that, on a single occasion, he saw a white driver sort packages on the conveyor belt and, on a single occasion, he saw one Black driver sort letters. Ellis Dep. at 219:14–220:6.

keep my monkeys on the dock." *Id.* at 122:22–125:14. Brandt then whispered something to McGrath, and, according to Robinson, after that McGrath gave the Black drivers "hell every night." *Id.* at 125:22–126:3. In fact, McGrath once told Robinson and two other Black drivers, "I know how to deal with your people. Your kind. I've dealt with your kind before, and I know how to deal with you-all." *Id.* at 85:7–15. And when Robinson replied that he would complain to the union and to DHL about McGrath's racist comment, McGrath did not deny that his comment was racist or clarify that Robinson had misunderstood him. *Id.* at 85:24–86:7. Rather, he called Robinson "a piece of shit." *Id.* Robinson also heard Berdis warn Shuray Buffkin that he would "beat" Buffkin's "[B]lack ass." *Id.* at 7:23–24, 35:3–5, 138:2–11.

Timothy Price was assigned by Brandt to load containers and trucks and build skids every day from 2007 to 2009. Price Dep. at 122:21–123:23. Price never saw anyone other than Black drivers working in the pit, and he never observed any Black drivers sorting letters. *Id.* at 125:13–18. When he complained to Brandt that Black drivers were always assigned to move and sort heavy freight in the pit, Brandt just told him to do the work. *Id.* at 123:24–125:2.

Throughout the summer of 2007, Jimmie Hayes was assigned to perform strenuous tasks in the pit, while white male drivers sorted letters. Def.'s Ex. 26, Hayes Dep. ("Hayes Dep.") at 9:21–10:7, 100:12–102:15, ECF No. 366-2. Although he saw some white drivers working in the pit, he does not recall seeing any Black drivers sorting letters. *Id.* at 100:23–101:11.

Every night when Sharon Robinson returned from her afternoon route at DPA, she first unloaded her truck, including the boxes and letters that were not delivered that day, scanned them into the system, and moved them to a cage to be put on the conveyor belt the next day. S. Robinson Dep. at 59:13–24. But that was not all. She also was required to scan and move the undelivered freight of other drivers. *Id.* at 59:13–63:2. Robinson frequently sorted heavy freight, and she

sometimes sorted letters, but not every night. *Id.* at 62:17–23, 88:9–12. She noticed that the majority of drivers who sorted heavy freight at DPA were Black, whereas the majority of those sorting letters were white. *Id.* at 88:13–89:89:5. Seeing how Black drivers were treated compared to white drivers made her feel angry and unappreciated. *Id.* at 89:20–90:7. She was afraid to voice her feelings, however, because whenever a Black driver complained, a supervisor would send the driver home for refusing work. *Id.* at 90:6–7.

Sandra Williams was assigned to handle heavy freight and load skids during her afternoon shift at DPA in 2005 and 2006. Def.'s Ex. 84, S. Williams Dep. at 68:11–18, ECF No. 366-5. Although she wanted to scan letters because the work was less laborious, she was never assigned to do so. *Id.* at 68:24–69:15. Rather, a white male driver named Chris and a white female driver named Kathy were assigned to scan letters. *Id.* at 70:10–22.

Randy Thompson recounted a similar story. After completing his route, a supervisor would ask him to quickly return his scanner to the office so that he could start working in the pit. Def.'s Ex. 76, Thompson Dep. at 30:1–20, 40:7–41:9, ECF No. 366-4. Meanwhile, white drivers would stand about laughing in the office and talking to the supervisor. *Id.* Moreover, supervisors forced Thompson to work overtime almost every other night. *Id.* at 57:18–23. He was assigned to perform heavy dock work every day, and he was only assigned to sort letters about three to four times a month after all of the freight had been loaded. *Id.* at 30:11–20, 57:24–59:8. Thompson also witnessed Brandt instruct Black drivers, who were assigned to sort letters, to stop doing so in order to allow white drivers replace them after returning from their routes. *Id.* at 102:3–6.

Lisa Huggins recalls that DPA supervisors always assigned Black drivers to load freight from the belt during the afternoon shift from 2005 to 2008. Def.'s Ex. 29, Huggins Dep. ("Huggins Dep.") at 83:1–5, ECF No. 366-2. She loaded heavy freight from the belt to containers, sorted

packages and letters, and helped drivers unload their trucks. *Id.* at 72:20–73:3, 76:13–14, 81:12–82:11, 83:1–5. She was allowed to sort letters only until white drivers returned from their routes, when the white drivers would take her place. *Id.* at 82:24–83:11, 84:22–24, 85:17–86:15. Huggins did recall seeing two white drivers work on the conveyor belt, but they were doing so by choice. *Id.* at 88:20–89:10.

Similarly, as well as loading and unloading freight in the pit, Derwin Brown would occasionally sort letters until white drivers returned from their routes. Brown Dep. at 95:8–96:7, 110:4–112:1. Brandt then would send him to work in the pit and assign the white drivers to sort letters. *Id.* Brown complained to Brandt, who explained that it was his prerogative to distribute the work. *Id.* at 110:17–112:1. Brown explained that the vast majority of letter sorters were white, while the vast majority of those in the pit were Black. *Id.* at 109:15–110:1.

Demario Jackson sorted letters twice in the two years he worked at DPA, yet he saw white drivers sort letters every day. D. Jackson Dep. at 87:7–22, 91:20–21. He mainly unloaded and sorted freight in the pit and "slotted" trucks, which involved moving trucks into position for loading and unloading. *Id.* at 87:7–17. Jackson did see a white driver process hard freight on one occasion, but Brandt quickly pulled the driver aside, telling him that he did not have to work with Jackson and the other Black drivers. *Id.* at 100:9–19. Jackson too noticed that Black drivers would only sort letters until white drivers returned from their routes, and then Black drivers were told to go work in the pit. *Id.* at 91:24–92:17.

Robert Lyons sorted letters an entirety of three or four times in the five years he worked on the DPA dock. Lyons Dep. at 44:2–6, 46:9–23. The rest of the time he worked on the hard freight line loading skids. *Id.* at 44: 2–6. The four drivers assigned to sort letters were mostly white, although supervisors sporadically allowed one or two Black drivers to sort letters. *Id.* at

101:11–102:11. Lyons and Paul Thomas were assigned to unload freight every day for their entire shift, while one to three white drivers unloaded freight for part of their shift only two to three times per week. *Id.* at 98:18–101:3.

Christopher Johnson noticed that white drivers predominantly sorted letters and only performed heavy dock work occasionally. C. Johnson Dep. at 89:17–96:24. By contrast, Johnson was allowed to sort letters only three times in two years. The rest of the time, he and ten other Black drivers, along with one or two white drivers, worked in the pit loading 1,000 pound containers into trucks. *Id.* at 88:6–7, 89:17–96:24, 98:10–106:22. According to Johnson, just four white drivers would occasionally help with hard freight. *Id.* at 107:19–108:7.

Michael Johnson also noted that Black drivers were only allowed to sort letters until white drivers returned from their routes. M. Johnson Dep. at 18:18–19:1, 91:22–94.3, ECF No. 366-2. Johnson loaded and unloaded C containers, trucks, and skids, all of which required lifting heavy freight. *Id.* at 18:18–19:1; 91:22–94:3. Meanwhile, he saw white drivers scanning, but not lifting, freight. *Id.* at 96:16–98:2. Johnson was only allowed to scan freight when there were no white drivers around. *Id.* at 18:18–24, 96:16–98:2. He complained to Brandt that Black drivers should be rotated with white drivers on the dock, but Brandt sent him back to the pit. *Id.* at 105:1–108:23, 169:1–170:23.

Reginald Kelly performed heavy dock work and drove a forklift nearly every day, and he scanned freight once a week. R. Kelly Dep. at 43:6–46:2, 47:23–50:3, 55:17–56:6, 58:7–12. He usually saw Black drivers doing heavy dock work, while white drivers sorted letters. *Id.* at 43:6–46:2, 84:22–85:9. Kelly asked to sort letters on occasion, but his requests were denied. *Id.* at 56:5–17, 57:6–58:4, 58:24–59:13. And he never saw any Black drivers sorting or scanning letters. *Id.* Kelly stated that, once or twice every week, he saw supervisors ignore white drivers who were

loafing around, while assigning additional work to Black drivers. *Id.* at 85:10–86:22. When Kelly asked a supervisor why a white driver could not do heavy dock work, he was told, "Because I want you to do it." *Id.* at 85:10–17.

George White also saw Brandt walk past white drivers, who were talking and not working, only to grill him and other Black drivers about why they were not doing more work. Def.'s Ex. 81, White Dep. ("White Dep.") at 37:7–39:22, ECF No. 366-5. White was assigned to perform heavy dock work every day and saw that Black drivers were routinely assigned more difficult and heavy tasks. *Id.* at 36:15–37:6, 79:15–81:15, 97:13–100:15; PSOAF ¶ 90(eee).

### 3. ORD (Franklin Park)

The EEOC and the remaining intervenors also claim that discriminatory dock assignments and dock segregation have occurred at DHL's ORD facility since 2005. In addition, in 2009, DHL consolidated its entire Chicago-based operations into the ORD facility. As a result, ORD took over the delivery and pick-up areas previously covered by the JOT and DPA stations. DHL Ex. 99, Langro Decl. ¶¶ 4, 6, ECF No. 366-8. And the EEOC and the remaining intervenors allege that supervisors at ORD have subjected drivers to discriminatory route assignments and route segregation since the consolidation.

### a. ORD Supervisors and Routes

At ORD, all supervisors were authorized to give out route and dock assignments. Montgomery Dep. at 14:17–22; Def.'s Ex. 91, Reese Dep. ("Reese Dep.") at 9:7–18, 79:1–6, ECF No. 366-5. Max Bachara, Steven Brandt, Philip Rinaldi, Ann Franz, Thomas Harding, Michael Montgomery, Rodney Powell, Chad Radcliff, Tom Thomas, and Steven Wiberding supervised the morning shift. Def.'s Ex. 83, A. Williams Dep. ("A. Williams Dep.") at 89:11–19, ECF No. 366-5; PSOAF ¶ 3(b); Def.'s Ex. 93, Rinaldi Dep. ("Rinaldi Dep.") at 18:8–19:1, 89:11–91:12, 124:14–

20, ECF No. 366-5; Montgomery Dep. at 12:15–13:1; Reese Dep. at 9:7–18, 79:1–6; *see* DHL's Answers Interrogs. After 2009, however, Montgomery typically assigned routes to drivers during the morning shift. Reese Dep. at 78:21–79:6.

James Altman, Brian Berdis, Ken Derus, Greg Kogut, Dennis Marshall, and Vincent Pryor supervised the afternoon shift. Def.'s Ex. 36, S. Jones Dep. ("S. Jones Dep.") at 106:1–24, ECF No. 366-2; Def.'s Ex. 52, Murphy Dep. ("Murphy Dep.") at 92:5–95:2, ECF No. 366-3; Def.'s Ex. 61, A. Robinson Dep. ("A. Robinson Dep.") at 43:3–11, ECF No. 366-4; Rinaldi Dep. at 203:1–16, 203:23–204:11; *see* DHL's Answers Interrogs.

Supervisors reported to the station manager, Philip Rinaldi, from 2005 to January 2009, and from September 2011 to the present. Rinaldi Dep. at 17:23–19:3; *see* DHL's Answers Interrogs. Rinaldi reported to Joseph Edell until 2009. Rinaldi Dep. at 13:24–15:14. After 2009, Rinaldi reported to the area manager, Joseph P. Yates. Def.'s Ex. 96, Yates Dep. at 15:22–16:18, 19:4–20:7, 31:9–32:18, ECF No. 366-5; *see* DHL's Answers Interrogs.; Montgomery Dep. at 73:6–78:19.

### b. Accounts of Discriminatory Route Assignments Post-2009 at ORD

Arthur Williams claims that he was assigned to routes in higher-crime areas in Humboldt Park and Pilsen since February 2010. Def.'s Ex. 83, A. Williams Dep. ("A. Williams Dep.") at 17:6–10, 57:3–19, 60:18–61:17, ECF No. 366-5.[32] But Williams has not provided any facts to

---

[32] In addition to Williams, forty-six other drivers have asserted that they worked at ORD. But it is undisputed (or deemed admitted) that they cannot assert a post-2009 discriminatory route claim, because (1) they worked routes from ORD prior to 2009, (2) they were not assigned a route at ORD or failed to identify a route assignment after 2009, or (3) they have disavowed such a claim. *Compare* Def.'s Ex. 105, Langenfeld Report ¶ 87 (citing Langenfeld Ex. 25) ("Langenfeld Ex. 25"), ECF No. 366-12, *with* Resp. DSOF ¶ 16 (admitting that Britton, Hopkins, and Murphy do not assert ORD route claims); *see* Allen Dep. at 87:9–23 (stating he was primarily assigned to the dock at ORD); Def.'s Ex. 3, Anderson Dep. ("Anderson Dep.") at 10:15–19, ECF No. 366-1 (stating he worked at ORD from 1999 to 2008); Bailey Dep. at 92:15–97:19 (describing route from CHI, not ORD); Def.'s Ex. 7, Brantley Dep. ("Brantley Dep.") at 72:12–19, ECF No. 366-1 (not complaining about ORD routes in LaGrange and Countryside in 2009); Brown Dep. at

support his contention that he had any negative experiences while driving in those areas. *Id.[33]* As a result, the EEOC has not adduced sufficient facts to support Williams's ORD route discrimination claim.

---

25:2–9 (denying experiencing discrimination at ORD); Calhoun Dep. at 32:18–33:13 (stating he was laid off in January 2009); Dean Dep. at 28:10–11 (admitting no problem at ORD); Edwards Dep. at 202:21–203:22 (saying he stopped working for DHL in 2008); Fefee Dep. at 91:23–92:3 (stating he was laid off in 2009 and returned to ORD in 2010 but only performed dock work); Foster Dep. at 17:19–21, 18:8–13, 40:3–5, 40:14–22 (working for DHL until 2008); Def.'s Ex. 21, Fulks Dep. ("Fulks Dep.") at 125:3–126:8, ECF No. 366-2 (same); Gilbert Dep. at 17:20–24 (not alleging discrimination at ORD); Green-Riley Dep. at 47:22–48:4 (same); Hayes Dep. at 23:11–12 (worked at ORD from 2000 to 2007); Hill Dep. at 51:2–3, 60:18–23 (worked at ORD in 2008); Huggins Dep. at 68:10–12 (last day working for DHL was in 2008); N. Jackson Dep. at 50:7–20 (denying discrimination after returning to ORD in 2010); C. Johnson Dep. at 10:13–14 (working for DHL until 2008); S. Jones Dep. at 32:21–24 (same); Def.'s Ex. 41, Lewis Dep. ("Lewis Dep.") at 130:3, ECF No. 366-3 (retired in 2008); May Dep. at 14:20–22 (resigned in 2006); McCall Dep. at 112:2–4 (stating he was never assigned route at ORD); Def.'s Ex. 48, McNeal Dep. at 49:11–52:19, ECF No. 366-3 (worked at ORD from 2005–2006); Medley Dep. at 43:24–44:10, 56:12–14 (stating he drove Arlington Heights and Lake Forest routes out of ORD and not describing any hardship relating to those routes); Def.'s Ex. 54, Oliver Dep. ("Oliver Dep.") at 12:4–6, ECF No. 366-3 (disavowing ORD route claim); Perry Dep. at 122:1–19 (stating she cannot recall any incidents of race discrimination at ORD); Def.'s Ex. 57, Quarles Dep. ("Quarles Dep.") at 104:23–24, ECF No. 366-3 (admitting he stopped working for DHL in 2008); Reams Dep. at 17:19–18:4 (never returning after injury in September 2005); Robertson Dep. at 46:4–11 (admitting he worked at JOT from 2005 to last day); A. Robinson Dep. at 32:8–33:18, 43:24–44:4 (denying having route at ORD); R. Robinson Dep. at 91:22–92:12 (stating his ORD routes were not in unsafe, predominantly Black areas); Shields Dep. at 49:24–50:10, 95:2–6, 95:17–96:5 (stating she drove ORD routes in Skokie, Franklin Park, Elk Grove Village, Elmhurst, Mount Prospect, LaGrange, and that they were not in unsafe or in predominantly Black areas); Smart Dep. at 31:2–11 (admitting he did not work at ORD after January 2005); Def.'s Ex. 69, D. Smith Dep. ("D. Smith Dep.") at 14:24–15:1, ECF No. 366-4 (last day was in 2008); Def.'s Ex. 73, Street Dep. ("Street Dep.") at 55:2–57:21, 65:23–66:13, 85:15–86:20, ECF No. 366-4 (fail to support that he had an ORD route before 2009); Studstill Dep. at 27:22–30:24 (omitting any discussion of a post-2009 route assignment in this or any other portion of his testimony); Thornton Dep. at 86:5–8 (laid off in 2008); White Dep. at 23:22–23:4, 62:7–63:9 (laid off in February 2009, rehired in March 2010, and declined route in 2010); Def.'s Ex. 84, Willis Dep. ("Willis Dep.") at 41:15–22, 97:19–23, ECF No. 366-5 (relying on incidents at ORD between 2003 and 2008); *see also* EEOC Claimant Chart, Renard Singleton & Sharee Washington entries (citing only JOT routes in support of route claim); PSOAF ¶ 2(eeee) (citing portions of Jamaine Young's deposition that refer solely to JOT routes); *see generally* Def.'s Ex. 68, C. Smith ("C. Smith Dep."), ECF No. 366-4 (solely discussing 2005 to 2008 timeframe at ORD). As a result, neither the EEOC on behalf of forty-six drivers nor the remaining intervenors—Oliver Dean, Melvin Edwards, Nathaniel Jackson, Edgar Medley, Sharee Washington, or George White—may assert a claim based on discriminatory route assignments at ORD.

[33] Furthermore, the EEOC concedes that Dr. DiPrete's analysis shows that ORD routes with a higher crime rate averaged only two more violent crimes and thirteen more property crimes each year for every 1000 residents from 2006 to 2012. *See* Resp. DSOF ¶ 20; PSOAF ¶ 8.

### c.     Accounts of Racial Segregation on the ORD Dock

Next, the EEOC and the remaining intervenors assert that the dock at ORD has been racially segregated since 2005. *Id.* According to Leslie Lewis, who worked at ORD in 2005, "[It was] the same routine every night, . . . the whites in this section, the [B]lacks in this section. You would think that it was 1940s in the south." Lewis Dep. at 151:21–24. Lewis recalls that white drivers sorted letters, while he and other Black drivers had to load and unload freight. *Id.* at 146:22–24. On the other hand, Lewis rarely was assigned to sorting letters and seldomly saw white drivers load and unload freight. *Id.* at 148:18–23; 149:17–21. Lewis recounts saying to his supervisors, "You should let the [B]lacks go through the letters and the whites do the boxes." But they would look at him like he was crazy and walk away. *Id.* at 152:4–9, 153:6–9. Or they would say, "You are assigned time slots, you are not assigned to a position." *Id.* at 173:20–23. Lewis's frustration with feeling like "a [B]lack man in a white country" at ORD affected his mental health to the point that he sought psychiatric care. *Id.* at 176:22–178:7.

Anthony McCall loaded forty-pound boxes into containers, trucks, or skids with five other Black drivers all night, every night from 2005 to 2008. PSOAF ¶¶ 90(ee), 93(e); McCall Dep. at 46:6–13, 112:8–113:11, 114:3–22, 124:12–125:3. "[A supervisor] put us in there every day. So it was just like a chain gang." McCall Dep. at 118:10–11. No white driver was assigned to stay on the dock for the entire shift. *Id.* at 116:12–14. And Jones never sorted or scanned letters, although two or three Black drivers were sometimes allowed to do so. *Id.* at 46:6–13, 116:15–21, 119:17–20.

Aldrich McNeal worked in the pit, scanning and loading freight every day. PSOAF ¶ 90(ff); McNeal Dep. at 49:11–52:19, 62:1–65:4. According to McNeal, "[B]lack drivers were the only ones in the pit 80% to 90% of the time," while three white drivers, at most, occasionally

worked in the pit. McNeal Dep. at 95:9–97:22. By contrast, the majority of drivers who worked on letters were white. *Id.* at 151:10–19. McNeal sorted letters one day per week on average. *Id.* at 64:20–65:1.

Alonzo Murphy worked in the pit in the afternoons under Pryor and Berdis. PSOAF ¶ 90(hh); Murphy Dep. at 92:5–93:17; DHL's Answer Interrogs. Murphy mostly saw Black drivers working in the pit, and, whenever a white driver was assigned to the pit, it was only for a short period of time. Murphy Dep. at 98:18–99:9. Murphy observed only white drivers working on letters. *Id.* at 95:3–18. On one occasion, Pryor assigned Murphy to scan letters, but Berdis told him that he did not belong there, even though Berdis knew that Pryor had authorized Murphy to do so. *Id.* at 94:2–95:2. According to Murphy, "Next thing I knew, I was back in the pit." *Id.* at 95:1–2. Murphy cannot recall any other Black driver who was allowed to scan letters. *Id.* at 95:3–18, 96:20–97:3, 97:13–22, 97:23–98:17.

According to Calvin Allen, in the afternoon shifts at ORD from 2005 through 2008, there were up to six people on the dock loading containers at any given time, and every single one of them was Black. Allen Dep. at 38:23–39:1, 90:19–23. Allen mainly lifted boxes from the belt and loaded them into containers on the dock. *Id.* at 87:6–23. Although he did not see or know of any Black driver who sorted letters, when he asked his supervisors for the assignment, his requests always were denied. *Id.* at 87:6–10, 89:7–18, 92:19–22. Allen says that it was demeaning to be put in a situation where Black drivers had to work in a designated area, apart from white drivers. *Id.* at 108:8–15.

Similarly, Edward May never saw a white driver on the dock in 2005 and 2006, except for a guy named "Scrappy," who drove a forklift and did not stack boxes by hand. May Dep. at 7:5–9, 15:17–16:15, 35:21–24, 96:7–97:2, 126:4–7, 126:16–127:23. Meanwhile, May had to load

containers and trucks and stack skids in the pit. *Id.* at 7:3–9, 92:24–93:6. He sorted letters only occasionally. *Id.* Working in a segregated environment increased May's stress level and greatly affected his mental health. *Id.* at 138:20–139:3.

### d. Accounts of Discriminatory Dock Assignments at ORD[34]

#### 1) Assignment of Work in ORD Pit as Punishment

While working on the dock at ORD in 2011, George White witnessed supervisors threatening to punish drivers by assigning them to the pit. White Dep. at 127:1–8. White heard them say things like, "[I'll] [t]ake you off that cake route and put you in the pit." *Id.* Curtis Smith also saw every supervisor in the afternoon shift at ORD use assignment to pit work as punishment.

---

[34] Certain drivers, including Derwin Brown, Oliver Dean, Paul Gilbert, Sharee Washington, do not assert a discrimination claim based on dock assignments at ORD. *See* Brown Dep. at 25:2–9; Dean Dep. at 26:19–22, 28:10–11; Gilbert Dep. at 17:20–24; Washington Dep. at 141:4–7.

In addition, the EEOC has failed to cite any facts indicating that Anthony Calhoun, Allan Robertson, Ryan Robinson, Kirby Smart, and Jamaine Young worked at ORD during the relevant timeframe. *See* Calhoun Dep. at 107:14–108:13, 111:3–13, 117:13–119:24 (describing incidents that occurred at ORD from 2003 to 2004); Robertson Dep. at 46:4–11 (worked at ORD from 1996 to 2004); R. Robinson Dep. at 36:21–37:22 (only worked at ORD on ten occasions); Smart Dep. at 31:2–11 (worked at ORD from 1986 to 1988); Young Dep. at 8:16–22, 105:7–107:23 (worked overnights at ORD before January 2005); *see also* PSOAF ¶ 2(eeee) (citing only dock discrimination at JOT for Jamaine Young).

Still others, including David Fefee, DeMarco Foster, Felicia Hill, Nathaniel Jackson, Christopher Johnson, Angela Perry, and Renard Singleton, do not describe their dock assignments at ORD with sufficient detail to give rise to a reasonable inference of discrimination. *See* Fefee Dep. at 95:14–97:20 (failing to detail the racial makeup of the ORD dock); Foster Dep. at 42:5–23 (same); Hill Dep. at 51:2–3, 61:14–62:3; N. Jackson Dep. at 146:1–24 (omitting any description of dock work at ORD); C. Johnson Dep. at 10:10–14, 53:1–8 (omitting description of race-based dock assignments at ORD); Perry Dep. at 122:1–19 (failing to recall with any specificity why she believes she was treated unfairly based on race at ORD); Singleton Dep. at 95:8–96:22 (stating that, when he complained about loading freight, supervisor Tom Thomas asked him what he preferred to do, and thereafter never had to load containers).

Accordingly, the EEOC and the remaining intervenors have not put forth sufficient facts to support a claim of discriminatory dock assignments at ORD as to the aforementioned drivers.

C. Smith Dep. at 94:16–96:4.  For example, supervisors would assign a driver to the pit if he missed a delivery time, saying, "He blew his window, put him in the pit," or "We will just put him in the pit tomorrow and that will teach him."  *Id.*  And after Darrell Smith complained that he was always assigned to unload containers in the morning before loading his truck, while white drivers were allowed to just load their trucks and leave, a supervisor removed him from the route he had been driving for years and assigned him to the pit.  D. Smith Dep. at 101:6–102:13, 104:2–13, 116:22–117:14.  In yet another instance, when Alonzo Murphy complained to supervisor Phil Rinaldi about route discrimination, Rinaldi took away his route and threw him in the pit, telling him to "watch [his] step."  Murphy Dep. at 102:16–103:11, 104:13–23.

### 2)  ORD Morning Shift

Melvin Edwards mostly unloaded heavy freight in the pit at ORD in the mornings from 2005 to 2007.  Edwards Dep. at 59:2–62:9, 88:23–89:23.[35]  According to him, of the thirteen drivers assigned to work in the pit, one was white in 2005, none was white in 2006, and one was occasionally white in 2007.  *Id.* at 107:7–108:4, 109:5–22, 111:8–112:22.  Conversely, Edward recalls that only one Black driver was assigned to sort letters in 2005, and just two Black drivers were assigned to work outside of the pit in 2006.  *Id.* at 108:13–24, 109:19–110:1.

Philip Hopkins worked the morning shift at ORD from 2005 to 2008.  Hopkins Dep. at 53:3–9, 55:1–9, 56:17–19, 57:8–10, 59:7–12.  Supervisors required him to unload and sort freight and load skids in the pit, before he could load his own truck and begin his route.  *Id.* at 80:21–81:15.  Although some white drivers would unload and sort freight before starting their routes, the majority of the time, that work was assigned to Black drivers.  *Id.* at 83:3–5.  Hopkins recalls that,

---

[35]  To the extent that DHL disputes the accuracy of the accounts of Edwards and the remaining drivers, the dispute merely serves to create a genuine issue of material fact for trial.

being required to work in the pit prior to loading his truck for his route was extremely stressful, because it routinely caused Hopkins to be one of the last drivers to leave the station, and made it more difficult for him to meet scheduled delivery times. *Id.* at 83:15–84:3. He complained every time he was called up front to work in the pit before his route and was told that it would be insubordination to refuse. *Id.* at 84:11–14. Although he wanted to sort letters with the white drivers, he was allowed to do so only every once in a while. *Id.* at 83:6–14, 84:15–21.

Jerry Thornton also had to work on the dock in the mornings at ORD. Thornton Dep. at 77:18–83:19, 93:3–21. He unloaded trucks a majority of the time and saw mostly Black drivers doing dock work. *Id.* After he complained to his supervisor about doing more than his fair share of loading freight, he was given lighter work for a couple of days only to be assigned, once again, to heavy freight work. *Id.* at 81:8–82:11. Thornton recalls that the occasions on which he was assigned to scan letters were few and far between, and whenever he was, he was replaced by white drivers returning from their routes, while he was told to load freight. *Id.* at 83:4–12.

Jimmie Hayes also recalls seeing only Black drivers performing strenuous work in the pit from 2005 through 2007. Hayes Dep. at 23:10–12, 61:6–23. During those three years, he recalls only working with one or two white drivers in the pit. *Id.* at 70:7–13. He was not allowed to sort letters very often, and when he did, he was pulled off of letter sorting and replaced by white drivers returning from their routes. *Id.* at 70:20–71:14. Such experiences left him feeling angry and devastated. *Id.* at 96:17–21.

Landers Oliver has worked the dock at ORD since 2009, and his supervisors have included Powell and Thomas. Oliver Dep. at 32:2–10, 74:8–13. According to Oliver, Powell and Thomas they discriminated against him based on race from 2009 through 2011 by assigning him to load containers and trucks every day, while never allowing him to scan letters. *Id.* at 56:12–16, 60:15–

17. He recalls loading containers regularly with seven Black drivers and one white driver, as well as sporadically with other white drivers. *Id.* at 65:2–67:5. Since 2012, however, Oliver has scanned letters three or four times per week alongside a white driver and a Hispanic driver. *Id.* at 55:16–56:9.

According to Arthur Williams he has seen all drivers unload containers at some point in his tenure at ORD, except for one white driver, John Hall, who was permitted to sort letters, before loading his truck for his route. Williams Dep. at 112:18–22. That said, sorting letters was almost exclusively done by white drivers. *Id.* at 130:17–131:14.[36] By contrast, Williams unloaded freight on the dock for most of his career, and he feels that supervisors have discriminated against him based on race by failing to rotate assignments between Black and white drivers. *Id.* at 42:18–23, 111:21–112:17, 112:18–114:6, 130:17–131:14, 132:12–20. Williams also believes that Bachara and Wiberding monitored Black drivers more aggressively than white drivers and assigned additional tasks to Black drivers, while white drivers congregated idly on the dock. *Id.* at 133:4–134:3. Williams injured his back in 2010 while moving a 5,000-pound container out of a truck on rollers. *Id.* at 133:4–24, 142:8–143:13; PSOAF ¶ 2(bbbb).

Benita Green-Riley worked on the dock loading and unloading freight from trucks, sorting freight, scanning freight, moving trucks, and running the conveyor belt. Green-Riley Dep. at 100:5–107:13. She recounts and that "it was rare" to see a white driver on the dock. *Id.* If she saw a white driver on the dock, he or she would be sorting letters, and Green-Riley does not recall ever seeing a Black driver sort letters. *Id.* at 107:3–13.

---

[36] Williams did not sort letters from 2005 to 2009 and has only sorted letters after he was recalled in 2010. *Id.* at 15:23–16:10, 100:12–105:16. Since 2010, he has not seen other Black drivers sorting letters. *Id.* at 42:18–23, 111:18–113:22, 130:17–131:14.

Edgar Medley worked in the pit during the morning shift at ORD in 2010. Medley Dep. at 46:14–18, 125:5–126:5. He unloaded containers and did other dock work every day. *Id.* at 125:22–23. Although supervisors assigned his white co-workers to sort letters, Medley was never allowed to do so. *Id.* at 126:6–127:13.

### 3) Drivers Who Worked ORD Morning and Afternoon Shifts

Thomas Britton worked the morning and afternoon shifts at ORD from 2005 to 2007. Def.'s Ex. 9, Britton Dep. ("Britton Dep.") at 14:4–10, 33:2–3, ECF No. 366-1. When Britton completed his route and put his freight from his truck on the belt before his shift ended, he was asked to load freight into containers and trucks on the dock afterwards. *Id.* at 85:3–87:10, 90:15–18. He performed that task with other Black drivers, and he does not recall working alongside any white drivers. *Id.* at 88:3–6. As Britton tells it, after white drivers returned from their routes and put the freight from their truck on the belt, no supervisor asked them to load freight into containers or trucks. *Id.* at 88:3–14.

Like Britton, Michael Fulks worked both shifts. Fulks Dep. at 113:15–22. Fulks recalls that he unloaded freight every morning in 2005, and that, of the sixteen drivers unloading freight, thirteen were Black, one was Hispanic, and two were white. *Id.* at 99:14–101:9. He also recalls that, in 2006, he loaded freight every night from 8:30 to 11:00 p.m. with eight Black drivers and only one white driver. *Id.* at 102:24–107:5.

When Sean Jones worked in the mornings and afternoons at ORD from 2005 to 2008, he was assigned to heavy dock work 75–80% of the time. S. Jones Dep. at 42:12–15, 136:11–12. In the mornings, Jones worked with nine other Black drivers, unloading and putting freight on skids to be loaded and weighed. *Id.* at 143:16–145:23. Jones sometimes saw one white driver shrink-wrapping skids. *Id.* at 144:24–145:7. But he saw mostly white drivers sorting letters. *Id.* at 145:9–

10. Sometimes he would see two Black drivers sorting letters, and maybe a third driver if she had finished her route early enough. *Id.* at 145:13–21. When he tried to voice his opinion about unequal treatment, his supervisors told him that he had no right to speak up for himself. *Id.* at 149:1–19.

Chris Quarles also worked the morning and afternoon shifts at ORD. Quarles Dep. at 35:17–36:1. In the mornings, he unloaded freight two or three times per week and scanned letters once or twice, but only when the white driver who normally did so was absent. *Id.* at 77:14–78:18, 95:18–101:2. Quarles also was assigned to fill supplies, but only when the white driver usually performed that task was absent. *Id.* at 76:13–23. During afternoon shifts, Quarles did heavy dock work every day, mostly alongside Black drivers, and he rarely saw white drivers doing the same work. PSOAF ¶ 90(*ll*); Quarles Dep. at 21:12–15, 35:17–36:1, 74:12–82:1, 130:24–131:6. Quarles recalled that the drivers who were assigned to work on letters were primarily white. Quarles Dep. at 21:12–15, 35:17–36:1, 76:13–78:23, 127:22–130:22.

Lewis Reams was assigned to perform heavy dock work during his entire time at ORD, and he noticed primarily Black drivers doing that type of work. PSOAF ¶ 90(mm); Reams Dep. at 11:24–12:16, 89:2–7, 90:6–92:23. He heard Reese tell Black jokes and say "n*gger" on multiple occasions. Reams Dep. at 94:14–97:7, 100:22–101:24. Reese required Reams and other Black drivers to unload trucks and containers before the Black drivers could go out on their routes. *Id.* at 90:6–92:23.

Aubrey Robinson worked the morning shift for two months before switching to the afternoon shift. He worked exclusively in the pit with up to eight other Black drivers. A. Robinson Dep. at 21:11–12, 27:6–28:2, 54:21–24, 56:14–22. In the afternoons, he reported to Altman, who is Black, and Marshall, who is white. *Id.* at 43:3–11; DHL's Answers Interrogs. Robinson asked Altman for work outside the pit, but Altman said "no." *Id.* at 50:19–51:1. Robinson asked

Marshall why only Black drivers were working hard in the pit, while everyone else was just walking around, and Marshall responded that he had nothing to do with it.  *Id.* at 53:8–55:17. While working in the pit, Robinson was permanently injured and required spinal fusion.  *Id.* at 21:11–12, 27:6–28:2, 66:2–4.  He has not worked since.  *Id.* at 21:11–12.

### 4)    ORD Afternoon Shift

Darrell Anderson worked the afternoon shift at ORD and was assigned to the pit with other Black drivers, loading freight from the belt into containers.  Anderson Dep. at 55:14–17, 57:9–61:22.  Loading freight and pushing filled containers onto trucks was much more strenuous than sorting letters and filling out paperwork.  *Id.* at 55:14–24, 60:4–62:13, 62:15–63:11.  One day, Anderson observed a white driver refuse an order by Altman to work in the pit, and Altman assigned him to sort letters.  *Id.* at 62:19–63:5.  Fifteen minutes later, a Black driver, Alonzo Murphy, did the same thing, and Altman threatened to send him home for refusing work.  *Id.* at 63:6–21.

Reginald Bailey worked in the pit at ORD in 2005 and noticed that, like him, the majority of those doing laborious jobs, such as moving freight off of the conveyor belt, loading containers, and pushing them on to trucks, were Black.  Bailey Dep. at 105:15–109:2.  He observed that the majority of those scanning freight, which was much easier work, were white.  *Id.*

Andrea Brantley was required every day to unload freight from a truck that was packed end to end.  Brantley Dep. at 149:4–10.  She observed that, at the same time, white drivers had barely any freight to unload from the trucks to which they were assigned.  *Id.* at 158:1–159:21. Brantley also recalls that the majority of drivers in the pit were Black, and only some were white. *Id.* at 121:1–122:2.  She would leave work at night in tears due to the unequal work assignments,

but she needed the job because she had small children. *Id.* at 150:3–14. Due to the stress, she experienced severe stomach pains. *Id.* at 150:24–152:21.

Lisa Huggins too worked on the dock during the afternoon shift at ORD in 2008, and she was assigned to lift heavy boxes into containers, sort freight, unload freight onto the conveyer belt, and sort letters. Huggins Dep. at 7:1–8, 34:10, 81:12–19. She recalls that supervisors always assigned Black drivers to unload freight onto the conveyer belt and assigned others to sort letters. *Id.* at 82:24–83:5. And whenever a Black driver was assigned to sort letters, a supervisor would replace the Black driver with a white driver as soon as the white driver returned from his or her route and reassign the Black driver to unload freight onto the belt. *Id.* at 83:6–11. In addition, white drivers would return from their routes and leave the freight on their truck and go straight to sorting letters, and supervisors would assign Black drivers to deal with that freight. *Id.* at 86:5–9. Although she could not say how often, Huggins saw two white drivers work on the conveyer belt because they chose to help out, not because it was assigned to them. *Id.* at 88:20–89:6.

Millicent Shields attests that she and fifteen Black drivers and one Hispanic driver regularly performed heavy dock work in the pit, and that three white drivers would be willing to help on occasion. Shields Dep. at 116:11–120:12. She scanned, sorted, and loaded freight every day. *Id.* at 111:19–23, 113:15–114:1. According to Shields, supervisors rarely pulled her off of doing freight to do letters, but whenever she was assigned to do letters, supervisors reassigned her to do freight three to four times per week. *Id.* at 114:19–115:4.

Curtis Smith loaded and unloaded freight in the pit two to five times per week. C. Smith Dep. at 74:19–24. He recalls seeing only one white driver and two Hispanic drivers work in the pit, and even then, it was only occasionally. *Id.* at 78:12–80:8. When Smith was not working in the pit, he drove a forklift, rerouted freight, and delivered and picked up packages. *Id.* at 71:16–

72:10; 72:23–24. Smith asked supervisors if he could sort letters and scan freight, rather than load it, but his requests were consistently denied. *Id.* at 73:2–3, 76:12–77:12. He only saw a Black driver sort letters, and it was on a Saturday when there was a skeleton crew. *Id*. at 79:18–20.

Toxey Street was assigned heavy dock work every day and loaded freight 90% of time through 2008. Street Dep. at 55:1–57:21, 60:19–21. On rare occasions, he was allowed to scan letters. *Id.* at 55:2–57:21, 61:20–62:18, 65:23–66:13, 67:4–8, 85:13–86:20. Although he does not recall the exact year, Street states that he was injured at some point between 2005 and 2008 due to continuously lifting heavy freight. *Id.* at 40:12–14, 86:21–87:4. When Street complained to supervisors that co-workers used the N-word and referred to him individually by saying "you guys don't do much work," supervisors said, "they're just kidding." *Id.* at 87:8–90:19. Not being taken seriously and being treated differently based on race made him feel like he was a person with "lower" status and unappreciated. *Id.* at 91:3–13.

According to George White, Black drivers were routinely assigned more difficult heavy lifting jobs. *Id.* at 36:15–37:6.[37] Although White often asked to sort letters, his supervisor denied his requests because he "didn't have enough guys to complete the job [of loading]." *Id.* at 59:20–62:6. From 2010 to 2012, White only sorted letters once for fifteen minutes. *Id.* at 2:8–9, 23:24–24:2, 61:1–12. White complained to DHL's Human Resources department that, other than one white driver, only Black drivers were doing heavy lifting in the pit, but nothing changed. *Id.* at 80:6–23, 110:24–111:20, 113:20–114:15, 127:9–18.

Sheldon Willis recalls occasionally seeing one white driver working on the dock with the Black drivers and some Hispanic drivers. Willis Dep. at 117:5–19. But he does not recall ever

---

[37]     Although DHL cites a portion of White's deposition for the proposition that White observed one white driver load trucks every day, the citation does not support DHL's denial because White was referring to DPA, not ORD. *See id.* at 80:10–23, 102:8–103:5.

seeing any white driver load freight onto a skid or truck between 2005 to 2008. *Id.* at 9:14–22, 119:3–5. And he does not remember seeing any Black driver scan or sort letters. *Id.* at 9:13–22, 95:6–96:19. Willis unloaded trucks, loaded skids, scanned and pushed packages down the belt, and loaded and unloaded trucks using a forklift or hand jack. *Id.* at 9:13–22, 90:23–92:8, 118:9–119:1. Through his experiences at ORD, he came to understand that Black drivers worked with freight and boxes, while white drivers worked with letters. *Id.* at 96:1–5, 118:7–120:12. Willis's experiences has negatively impacted him psychologically. *Id.* at 120:13–18.[38]

## II.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir.

---

[38]    In addition to the claims raised on his behalf by the EEOC, Intervenor Nathaniel Jackson asserts that DHL discriminated against him based on race and religion at its CHI station. N. Jackson Compl. ¶¶ 14–19, ECF No. 128. Specifically, Jackson asserts that DHL denied him opportunities for promotion and that CHI supervisor Michael Murphy denied him a ramp badge, disciplined him for not working on a Jewish holiday, and told inappropriate jokes about his being Black and Jewish. *Id.* ¶¶ 14–19.

Except for two statements of additional fact, however, neither the EEOC nor the intervenors submitted any facts addressing his individual claims. *See* PSOAF ¶¶ 1–135 (omitting any statement of fact regarding Nathaniel Jackson's individual claims); Intervenors' Statement of Additional Facts ("ISOAF") ¶¶ 66–67, ECF No. 371 (stating that he complained that an area manager named Mike Simpson at CHI had a visible Confederate flag tattoo on his arm). And, not surprisingly, those two statements of additional fact, together with DHL's two statements of fact that address Jackson's individual claims, are wholly insufficient to support these claims. *See* DSOF ¶¶ 11, 130; ISOAF ¶¶ 66–67.

In any event, Jackson states that he never applied for a promotion and had no reason to know whether he was qualified for one. N. Jackson Dep. at 153:13–154:14. Jackson also admits that Murphy had sent him to get his ramp badge, but, due to unforeseen reasons, he could not take the class. *Id.* at 19:19–20:8. What is more, he attests that he was not disciplined for taking off work on Yom Kippur. *See id.* at 87:3–5. Lastly, Jackson has not provided any statement of fact regarding the specifics of Murphy's inappropriate jokes, and even if he had, he has not tied them to any adverse employment action. As a result, there are insufficient facts in the summary judgment record to support Jackson's individual race- and religion-discrimination claims.

2021) (cleaned up). In determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020).

"On summary judgment [a court does] not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). "[N]o matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party." *Id.*

### III. <u>Analysis</u>[39]

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" or "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color,

---

[39] The following analysis pertains to only those drivers as to whom the EEOC has presented sufficient evidence in support of their route and/or dock discrimination claims. With three exceptions, each driver has presented sufficient facts to support at least one route or dock discrimination claim, as well as a segregation claim.

The exceptions are Philip Azor, DeMarco Foster, and remaining intervenor Miranda Lester. The summary judgment record is devoid of sufficient facts to support a reasonable inference of racial discrimination or segregation as to these three drivers. *See* Azor Dep. at 41:23–42:21, 52:2–56:18 (stating that, at JOT, he very seldomly drove a route in a predominantly Black, nonwhite, higher-crime area, and admitting he unloaded his truck after his route like white drivers, as well as sorted letters and slotted trucks); Foster Dep. at 90:1–19, 99:8–11 (stating he requested city routes at JOT and that he does not believe that the dock assignments there were based on race); Lester Dep. at 62:7–63:13, 65:22–24, 67:9–68:10, 69:16–19 (admitting she was happy driving her DPA route in the suburbs and conceding that she mostly scanned letters and would not have preferred to do anything else). Accordingly, DHL's summary judgment motion is granted in full as to the EEOC's claims on behalf of Azor, Foster, and Lester, as well as Lester's claims as a remaining intervenor.

religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1)–(2). Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Because § 1981 claims "are evaluated under the same rubric as Title VII claims," the Court will address them together. *Williams v. Waste Mgmt. of Ill., Inc*., 361 F.3d 1021, 1028 (7th Cir. 2004).

## A.     Race Discrimination Claims

In discrimination cases, "[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . adverse employment action." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) (cleaned up). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, th[e] [Seventh Circuit] made clear in *Ortiz* . . . that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)).[40]

### 1.     Adverse Employment Action

DHL first asserts that neither assigning a driver to a more dangerous or arduous route, nor assigning a driver to more strenuous dock work, is an adverse employment action. In DHL's view, because delivering and picking up packages and performing dock work are tasks within the scope

---

[40]     The parties agree that the EEOC must establish each individual driver's claims. Each driver, however, may rely on evidence that DHL mistreated other Black drivers as circumstantial evidence to support an inference of discrimination and segregation regarding that driver's claims. *See Vega v. Chi. Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020) ("[B]ehavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination . . . ." (cleaned up)); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." (cleaned up)).

of a driver's duties, a driver does not suffer a materially adverse employment action when the driver is assigned to perform one route or dock task versus another.

DHL is incorrect. "Recognizing that job discrimination may take many forms, Congress cast the prohibition of Title VII broadly to include subtle distinctions in the terms and conditions of employment . . . ." *Collins v. State of Ill.*, 830 F.2d 692, 703 (7th Cir. 1987) (cleaned up). Accordingly, an adverse employment action occurs where a work condition "subjects [an employee] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment——an alteration that can fairly be characterized as objectively creating a hardship[.]" *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). To establish an adverse employment action, a plaintiff must show "an injury or harm" that "a reasonable employee would have found . . . materially adverse." *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 67–68 (2006); *see also Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015).

DHL leans heavily on *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 504–05 (7th Cir. 2004), for the proposition that an assignment within the scope of one's job duties cannot be an adverse employment action. But *Rhodes* was overruled by *Ortiz* due to its reliance on the now-defunct "convincing mosaic" requirement in holding that the plaintiff had not presented sufficient convincing evidence that she suffered an adverse employment action. 834 F.3d at 764–65. In any event, *Rhodes* is readily distinguishable. *Rhodes* did not consider or discuss the category of adverse employment action that has been asserted here, *i.e.*, a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in one's workplace environment. Accordingly, DHL's reliance on *Rhodes* is misplaced.[41]

---

[41] In the same vein, the Court also notes that DHL's cited decision, *Carl v. Parmely*, was issued prior to *Herrnreiter* and does not question or analyze whether a work condition subjected the plaintiff to a

a.   **Route Claims**

1)   **Routes in Predominantly Black, Nonwhite, Higher-Crime Areas as Adverse Employment Actions**

When the summary judgment record is viewed in the light most favorable to the EEOC, there is evidence to support a reasonable inference that assigning a driver to a route in a predominantly Black, non-white, higher-crime area is a significantly negative work condition that may fairly be characterized as objectively creating a hardship.

As an initial matter, many drivers, Black and white alike, found routes in predominantly Black, non-white, higher-crime areas to be more difficult. *See* PSOAF ¶¶ 27, 31–33, 42; *see also e.g.*, JC Johnson Dep. at 74:2–75:23 (white driver Mark Flanagan refused to drive South Shore route); Def.'s Ex. 45, Martin Dep. at 45:2–48:1, ECF No. 366-3 (white driver refused to drive Englewood route); McNeely Dep. at 55:12–57:24 (white driver Tommy Grogan refused to drive Roseland route); Buffkin Dep. at 64:2–65:20 (describing shootings in an area called "The Hill" on the Joliet route out of DPA); Medley Dep. at 58:12–59:14 (JOT supervisor Pehlke describing Englewood as a "rough area" and stating that he would be scared to go to there).

While on route in predominantly Black, non-white, higher-crime areas, drivers: were targets of thrown projectiles like eggs, rocks, fruit, and soda; were approached by gang members; observed beatings; heard gunfire; saw a person brandishing a gun; witnessed someone in a car being shot multiple times by a perpetrator with a firearm; viewed a body lying on the ground after being shot; saw a gunshot victim dying next to the DHL truck; observed dead bodies on the ground; witnessed an armed robbery; experienced a DHL truck being stolen while at the back of the truck;

---

humiliating, degrading, unsafe, unhealthful or otherwise significantly negative alteration in her workplace. *See* 188 F. Supp. 2d 991, 1004–05 (S.D. Ill. 2001) (granting summary judgment and holding that even if plaintiff had raised a triable issue regarding whether she had been assigned the worst and riskiest jobs within her job description, it would still not constitute an adverse employment action). Accordingly, the Court finds *Carl* unpersuasive as well.

and had packages and personal items stolen from a DHL truck. *See* Akenton Dep. at 105:19–106:10 (Gary, Indiana route); Fefee Dep. at 72:17–73:21 (Englewood route); Green-Riley Dep. at 55:6–19 (Chicago Heights route); Haven Dep. at 71:6–24 (South Shore/Calumet route); JC Johnson Dep. at 30:10–21, 61:23–24, 62:19–64:18, 73:11–13, 80:3–5, 91:2–5, 99:6–9 (South Shore route); M. Johnson Dep. at 67:14–70:18 (Aurora route); McCall Dep. at 91:10–23 (Englewood route); Redd Dep. at 53:4–8 (Englewood route); Scott Dep. at 38:13–39:8 (Riverdale route); Smart Dep. at 67:4–68:1 (Chatham/Chesterfield route); W. Smith Dep. at 57:21–58:13 (South Shore route), 80:16–81:7–23 (Roseland route); L. Stewart Dep. at 93:17–19, 99:23–100:21 (South Side Chicago route); Wetherspoon Dep. at 109:20–110:5 (Altgeld Gardens route); *see also* Wetherspoon Dep. at 40:3–10 (explaining why driving routes in predominantly Black, lower-income areas were more difficult).

Additionally, there is evidence to support a reasonable inference that being assigned to a route in a predominantly Black, higher-crime area was objectively degrading. Some supervisors told Black drivers that they were assigned to such routes based solely on their skin color. *See* Haven Dep. at 125:7–129:10 (JOT); N. Jackson Dep. at 192:23–193:21 (DPA); Medley Dep. at 67:9, 161:8–162:5 (JOT); Robertson Dep. at 132:25–134:1, 142:8–16 (JOT); W. Smith Dep. at 76:22–77:14 (JOT); Studstill Dep. 179:7–180:20 (JOT). At least one Black driver assigned to a route in a predominantly Black, higher-crime neighborhood was laughed at by white drivers who bragged that they never had to drive routes in such areas. McCall Dep. at 129:15–133:7 (JOT). In addition, Black drivers were told that they were assigned to such routes because white drivers had refused to drive them. *See* Fields Dep. at 76:20–77:3, 102:23–103:2 (JOT); JC Johnson Dep. at 69:11–24; 74:2–75:23 (JOT); Martin Dep. at 45:12–46:7 (JOT); McNeely Dep. at 55:12–57:24, 57:10–24, 91:9–22, 131:4–22, 132:21 (JOT); Miller Dep at 84:17–22, 92:24–94:12 (JOT); Smart

Dep. at 156:3–157:7 (JOT). And Black drivers were laughed at by supervisors when they reported observing dangerous incidents or being the victim of criminal conduct during their routes in such neighborhoods. *See* Bonslater-Burnett Dep. at 79:7–22 (JOT); J. Jones Dep. at 65:13–15, 68:12–69:1 (JOT).

Moreover, when Black drivers complained to supervisors based on their observation that white drivers were not assigned to routes in predominantly Black, higher-crime areas, supervisors tried to brush aside or minimize these complaints by telling Black drivers that what they saw was not happening. Akenton Dep. at 86:13–21, 87:8–12 (JOT). Or they tried to hide their discriminatory intent by claiming that route assignments were based on a driver's familiarity with the area, even though they assigned Black drivers to routes in primarily Black, higher-crime areas with which they were unfamiliar. *Compare* DSOF ¶¶ 30–34, 76, 91–92, 144, *with* Bonslater-Burnett Dep. at 71:18–74:3 (JOT); *see also* Buffkin Dep. at 64:7–65:10 (DPA); N. Jackson Dep. at 137:19–139:21 (DPA); Miller Dep. at 84:17–22, 92:3–94:12 (JOT); Price Dep. at 87:8–9, 90:1–5 (DPA); Smart Dep. at 80:81–4 (JOT); G. Stewart Dep. at 46:3–21 (JOT). A rational jury could conclude from all of these facts that being assigned to a route in such an area was a "humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [the] workplace environment" that "objectively creat[ed] a hardship." *See Herrnreiter*, 315 F.3d at 744; *cf. Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 343 (6th Cir. 2001) (reversing grant of summary judgment where an issue of material fact existed regarding whether correction officer's being subjected to more prisoners' threats presented an objective hardship to a reasonable person).

DHL argues that courts have rejected the theory that an assignment to a locale with a different social and economic composition constitutes an adverse employment action. But the cases DHL cites involved constructive discharge claims. *See Anzaldua v. Chi. Trans. Auth.*, No.

02 C 2902, 2002 WL 31557622, at *3 (N.D. Ill. Nov. 15, 2002) (dismissing a constructive discharge claim because the Hispanic plaintiff had merely alleged that her transfer added three hours to her daily commute and that the new route served a predominately Black and presumably hostile environment); *Jackson v. Fed. Express Corp.*, No. 10 C 5837, 2012 WL 171336, at *3–4 (N.D. Ill. Jan. 20, 2012) (granting summary judgment as to a constructive discharge claim because the plaintiff failed to adduce any evidence that her new route was dangerous). In each of these cases, the plaintiff bore the burden of proving that "working conditions were so intolerable that a reasonable person would have been compelled to resign." *Anzaldua*, 2002 WL 31557622, at *3 (cleaned up); *accord Jackson*, 2012 WL 171336 at *2. By contrast, the EEOC does not bear such a burden. Rather, it need only establish a triable issue as to whether being assigned routes in a higher-crime area is a significantly negative work condition that may fairly be characterized as objectively creating a hardship Based upon the summary judgment record, the Court concludes that it has done so.[42]

DHL also argues that the assignment of routes in predominantly Black, higher-crime areas cannot constitute an adverse employment action as a matter of law, because route assignments implicate only subjective preferences. *See Burlington*, 548 U.S. at 67–68 (holding that whether a work condition gives rise to a significantly negative hardship is an objective, not a subjective, inquiry). In support, DHL relies on *Nichols v. Southern Illinois University-Edwardsville*, in which the Seventh Circuit affirmed the grant of summary judgment in the defendant's favor, because the plaintiffs failed to support their claim that the defendant disproportionately assigned officers based

---

[42]     For similar reasons, the Court finds DHL's reliance on *Lancaster-Williams v. PODS Enterprises, Inc.*, unavailing. No. 08 C 7144, 2010 WL 2382402, at *9 (N.D. Ill. June 10, 2010) (granting summary judgment in the defendant's favor where, beyond the plaintiff's unsupported characterization, he had not presented evidence that particular job assignments were degrading and unsafe work conditions).

on race and because three of the four plaintiff police officers requested the work assignment that they alleged to have been an adverse employment action. 510 F.3d 772, 781 (7th Cir. 2005). But here, the EEOC has created a triable issue regarding whether a route assignment to a predominantly Black, higher-crime area could constitute an adverse employment action. Moreover, it has presented statistical analysis to support the conclusion that DHL disproportionately assigned drivers to such routes. Accordingly, the Court finds DHL's reliance on *Nichols* misplaced.

DHL's citation to *McQueen v. City of Chicago*, No. 09 C 2048, 2014 WL 1715439 (N.D. Ill. Apr. 30, 2014), also is unhelpful. In *McQueen*, the district court granted summary judgment to the defendant as to four police officers' race discrimination claims based on its conclusion that the assignment of the officers to certain posts at O'Hare Airport was not an adverse employment action. *Id.* at *2. The *McQueen* court reasoned that, because one of the four plaintiffs preferred to work at two of the six undesirable posts, it necessarily followed that *none* of the officers could establish that assignment to *any* of the six posts constituted an adverse employment action. Although the Court agrees with *McQueen* to the extent that an officer's preference for a post would preclude that particular officer from claiming discrimination based upon assignment to that post, it does not ineluctably follow that none of the posts could be considered to be an objectively negative alteration of the work environment for all of the officers.

DHL also contends that certain drivers preferred routes in predominantly Black, higher-crime areas, but its citations to the record do not support this contention. For example, DHL cites to (1) Reginald Bailey's, Felicia Hill's, Philip Hopkins's and Nathaniel Jackson's preference for routes at CHI—a station that is not part of this lawsuit; (2) various drivers' liking their routes in lower-crime areas; (3) Ronnie Ford's liking the area where DPA was located; and (4) Percy Fields's, Nicholas Green's, and Robert Lyons's experiences on bulk freight routes that are not the

subject of this litigation. *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 17–18, ECF No. 364; DSOF ¶ 37 n.9.[43] And to the extent that DHL points to certain drivers who preferred or requested a particular route in predominantly Black, higher-crime areas, this only establishes that those particular drivers cannot establish that being assigned to those particular routes constituted an adverse employment action. *See* Brown Dep. at 78:15–81:1–5, 84:24–85:2, 85:7–86:4; Haven Dep. 70:10–16. But it does not preclude these drivers' discrimination claims based on other routes. Nor does it prohibit any other driver from establishing that being assigned to those or other routes was objectively a significantly negative alteration in his or her workplace environment.

In sum, the Court concludes that, based on the accounts provided by the individual drivers as well as DiPrete's analysis showing that Black drivers were assigned to more routes in primarily Black, higher-crime areas than their white counterparts to a statistically significant degree, the EEOC has created triable issues of fact regarding whether Black drivers were subject to an adverse employment action.

### 2) More Arduous Routes as Adverse Employment Actions

The EEOC also has created sufficient issues of fact as to whether being assigned to a route that required significantly more arduous work constitutes an adverse employment action. For example, Brandt assigned Paul Gilbert to a route previously assigned to a white driver and a helper that involved parcels weighing between 150 and 300 pounds, yet he refused Gilbert's requests for a helper. Gilbert Dep. at 18:3–21:23. Brewster assigned Demario Jackson to a route previously assigned to a white driver, who merely loaded pre-packed skids and brought the truck back, whereas Brewster required Jackson to sort the freight, load freight onto skids, wrap the skids, load

---

[43]     In addition, DHL's reliance on Demario Jackson's stating that he felt unsafe when delivering packages to a residence in a predominantly white neighborhood at 11:00 p.m. is irrelevant to whether a rational jury could find that drivers' being assigned to routes in primarily Black, higher-crime areas is objectively a significantly negative alteration of the work environment.

the freight onto the track, bring it back, and handle the freight again.  D. Jackson Dep. at 74:9–76:9, 78:1–5, 82:14–23, 85:10–86:12, 92:11–22, 94:20–95:24, 158:12–160:15; *see also* McNeal Dep. at 91:19–94:20; Price Dep. at 41:9–43:14; Kogut Decl. ¶ 15.  Szajkovics assigned Angela Perry to a morning-shift route that required her to drop off and pick up so much freight that it kept her on the route past 9:00 p.m., after the afternoon shift had already left, and her complaints regarding the heaviness of the route went ignored.  Perry Dep. at 64:3–69:22; *see also* Smith Dep. at 76:22–77:14.  And Pehlke assigned David Fefee to a route so heavy that, when Fefee went on vacation, DHL assigned three drivers to complete the route that Fefee usually drove alone.  Fefee Dep. at 77:20–80:17.  A rational jury could conclude from these facts that a reasonable employee would objectively find that assignment to these and other, similarly demanding routes constituted a significantly negative work condition.

Based on the accounts of these and other drivers, James Long's declaration that Black drivers were assigned to longer and more difficult routes at JOT, as well as DiPrete's analysis concluding that Black drivers were assigned more difficult routes than their white counterparts to a statistically significant degree at JOT and DPA, the Court finds that the EEOC has created a triable issue of fact regarding whether Black drivers were subjected to adverse employment actions as compared to their white counterparts.

### b.    Dock Work Claims

Similarly, the record contains genuine issues of material facts as to whether the assignment of Black drivers to freight work in the pit subjected them to a significantly negative work condition that objectively created a hardship.  One factor to consider when determining whether a challenged action is materially adverse is whether the action was imposed as a punishment.  *See Campbell v. City of Chi.*, No. 12 C 1165, 2013 WL 4501026, at *4 (N.D. Ill. Aug. 21, 2013); *see also Goodman*

*v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 655 (7th Cir. 2010); *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1119 n.2 (7th Cir. 2001); *Serna v. City of San Antonio*, 244 F.3d 479, 484 (5th Cir. 2001). And there are facts in the record to support the conclusion that assignment to particular dock work was considered punishment by DHL supervisors due to its difficulty. *See, e.g.*, JC Johnson Dep. at 79:19–85:10 (JOT); Redd Dep. at 99:12–100:6 (JOT); Scott Dep. at 38:13–43:10 (JOT); R. Robinson Dep. at 101:22–24 (DPA); M. Johnson Dep. at 38:2–4 (DPA); Murphy Dep. at 102:16–103:11, 104:13–23 (ORD); White Dep. at 127:1–8 (ORD); C. Smith Dep. at 94:16–96:4 (ORD); D. Smith Dep. at 101:10–102:13 (ORD).

Moreover, when the record is viewed in EEOC's favor, there is sufficient evidence from which a reasonable jury could find that being assigned to the pit was a humiliating, degrading, or otherwise significantly negative alteration in the workplace environment that objectively created a hardship. *See, e.g.*, JC Johnson Dep. at 94:4–7, 101:15–23, 126:2–3 (JOT Supervisor Pehlke's stating, when asked why only Black drivers unloaded freight in the pit without any sort of rotation with white drivers, "Just act like you are picking cotton," and, "Well, you are just doing what you guys are good at. You are good laborers."); Thornton Dep. at 26:13–16, 77:18–83:19 (stating that the few times he was allowed to sort and scan letters at JOT, he was replaced by white drivers returning from their routes and he was told to return to the pit); McNeal Dep. at 101:7–102:1 (same); McNeely Dep. at 91:23–93:2, 134:22–136:5 (same); Green Dep. at 102:16–102:23 (stating that white drivers were allowed to talk, were assigned to scan the little stuff, and had the radio playing, whereas Black drivers were not allowed to talk, were assigned to lift the heavy freight, and were not allowed to listen to music, at DPA); R. Robinson Dep. at 121:21–122:4, 122:22–125:14, 126:17–21 (recounting DPA supervisor Brandt's responding to a Black driver's complaint about dock assignments by handing him a banana, calling him a monkey, and stating, "I keep my

monkeys on the dock"); Huggins Dep. at 82:24–83:11, 84:22–24, 85:17–86:15 (stating that she would only sort letters at DPA until white drivers returned from their routes, and then was sent to load freight in the pit); M. Johnson Dep. at 18:18–24, 96:16–98:2 (stating that he was required to load heavy freight at DPA and was only allowed to scan freight when there were no white drivers around); Thornton Dep. at 83:4–12 (stating that the few times he scanned letters at ORD, he was replaced by white drivers who returned from their routes and was told to load freight); Lewis Dep. at 151:21–24 (stating that, at ORD from 2005 to 2008, "[it was] the same routine every night, . . . the whites in this section, the [B]lacks in this section. You would think that it was 1940s in the south"); Britton Dep. at 14:4–10, 33:2–3, 85:3–90:18 (stating that, more often than not at ORD, when he returned from his route, he was required to load freight into containers and trucks, but supervisors did not require white drivers to do so).

In response, DHL contends that certain drivers had preferences for work assignments involving the loading and unloading of cargo planes and driving to the ramp at the airport. Def.'s Mem. at 18–19. But the discrimination claims at issue are based on the assignment of work on the JOT, DPA, and ORD docks, not work that occurred while loading and unloading cargo planes at airport ramps. Furthermore, DHL's reliance on Percy Fields' statement that he liked bulk freight routes at the CHI station (routes that are not at issue in this case) does not support a reasonable inference that he preferred lifting heavy freight in the pit at JOT. *See* Fields Dep. at 64:5–15. Likewise, Michael Lowe's statement that he liked to leave the JOT station and drive a truck to the ramp at the airport because he preferred to move around rather than be stuck at one spot does not create a reasonable inference that he preferred loading heavy freight onto the conveyor belt over sorting letters. *See* Lowe Dep. at 81:15–24.

DHL also argues that some drivers did not care whether they performed heavy dock work or sorted letters. But this fact is hotly contested. *Compare* DSOF ¶ 78, *with* Resp. DSOF ¶ 78. And to the extent that DHL relies on the testimony of Miranda Lester, Sandra McNeely, or Millicent Shields to support its argument here, the Court has already determined that these drivers may not proceed with their discriminatory dock assignment claims.

Because there is evidence in the record that Black drivers were assigned more arduous dock work, the Court finds that the EEOC has created triable issues of fact regarding whether assignment of Black drivers to the dock subjected them to adverse employment actions.

### 2.  Pretext

DHL next posits that the challenged route and dock work assignments were based on legitimate, nondiscriminatory reasons. To overcome such an assertion, "an employee may show that the employer's reason had no basis in fact, that the explanation was not the real reason for its action or that the reason stated was insufficient to warrant the adverse job action." *Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (cleaned up). In other words, the employee must provide some evidence that the employer did not honestly believe the reasons it proffers for the adverse employment action, which instead serve as a mere pretext. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921 (7th Cir. 2001).

### a.  Route Assignments

First, DHL asserts that a driver's bid for a station and time slot affected the routes to which he or she was assigned, not her race. *See* DSOF ¶¶ 23, 30. For example, DHL argues that drivers who bid into JOT were by definition more likely to draw a route assignment that had relatively more Black residents or higher rates of poverty and crime compared to routes from other DHL stations; yet, while twenty-nine drivers had enough seniority to bid out of JOT and into another

DHL station, they chose not to because they preferred to work at JOT. *Id.* ¶¶ 22, 29. But DHL's position is based on a fundamental misunderstanding of EEOC's claim. The EEOC is not arguing that drivers should never have had to work on certain routes, but, rather, that Black drivers should not have been assigned to routes in predominantly Black, higher-crime areas at a disproportionately high rate, when compared to their white counterparts.

Next, DHL asserts that a driver's experience and familiarity with the area covered by a route was the determining factor when she was assigned to a route. *See* DSOF ¶¶ 30–34, 76, 91–92, 144. But the EEOC points to evidence supporting a reasonable inference that Black drivers only became familiar with predominantly Black or higher-crime areas *because* they were assigned to those routes. *See, e.g.,* Resp. DSOF ¶¶ 30–34, 76, 91–92, 144; PSOAF ¶ 33b; Buffkin Dep. at 64:7–65:10 (DPA); N. Jackson Dep. at 137:19–139:21 (DPA); Miller Dep. at 84:17–22, 92:3–94:12 (JOT); Price Dep. at 87:8–9, 90:1–5 (DPA); Smart Dep. at 80:81–4 (JOT); G. Stewart Dep. at 46:3–21 (JOT).[44] Additionally, a reasonable jury could find that white drivers were not assigned to routes servicing predominantly Black, higher-crime neighborhoods, and, therefore, could not have gained experience or familiarity with such routes. *See, e.g.*, PSOAF ¶¶ 31f, 49; Long Decl. ¶ 4 (stating that area manager refused to cross-train white and Black drivers on routes at JOT); Fefee Dep. at 126:16–127:16, 135:11–136:3 (JOT); McCall Dep. at 129:20–133:4 (JOT); Medley Dep. at 67:9, 161:8–162:5 (JOT); N. Jackson Dep. at 192:23–193:21 (DPA); R. Robinson Dep. at 58:5–8, 61:1–7 (DPA); Smart Dep. at 156:3–157:7 (JOT). Given that a reasonable jury could find that DHL supervisors initially assigned routes based on race, a reasonable jury also could conclude that supervisors would not generally change a driver's existing route assignment unless there was

---

[44]     According to Alma Bonslater-Burnett, after Sintich had promised her the Orland Park route because she was familiar with the route, he gave it to a white driver and explained that the white driver lived in Orland Park. Bonslater-Burnett Dep. at 71:18–74:3. And when Bonslater-Burnett reminded Sintich that she lived in Orland Park as well, he walked away without any explanation. *Id.*

an open route or other operational need, thereby perpetuating the discrimination. *See* DSOF ¶ 32; *see also* Long Decl. ¶ 4(b) (JOT supervisor stating that open route assignments at JOT were often given out to white drivers prior to being posted).

What is more, the EEOC points to evidence that managers simply assumed, based on a racial stereotype, that Black drivers were familiar with predominantly Black, higher-crime areas. For example, Szajkovics told William Smith that he tried to keep Black drivers on the South Side of Chicago because they are familiar with area, even though Smith lived in Richton Park, a suburb of Chicago. W. Smith Dep. at 14:5–21, 76:12–77:6. And Brandt told Michael Johnson that he thought all Black people lived on the South and West Sides of Chicago. M. Johnson Dep. at 113:19–22.

Nevertheless, DHL insists that managers and supervisors were unaware of which routes included predominantly Black, higher-crime areas or whether a particular route was a heavy route. *See* DSOF ¶¶ 35–36. In support, DHL has cited the testimony of Rinaldi and Yates. As indicated above, however, the EEOC has created triable issues of fact regarding route claims at JOT and DPA, and Rinaldi did not work at either station after 2000. Rinaldi Dep. at 12:7–9, 366-5. Moreover, as area manager at DPA from 2005 to 2008, Yates had no responsibility for route assignments. Yates Dep. at 50:24–51:7. Moreover, the EEOC points to numerous statements by DHL supervisors and complaints by drivers from which a reasonable jury could conclude that they knew which routes included predominantly Black, higher-crime areas, and which routes required more work. *See, e.g.*, Bonslater-Burnett Dep. at 79:7–80:19; Fefee Dep. at 77:20–80:17; Hill Dep. at 54:9–55:9; N. Jackson Dep. at 192:23–193:21; JC Johnson Dep. at 63:16–64:14, 65:21–67:20; J. Jones Dep. at 65:7–66:3, 68:12–69:1; McCall Dep. at 85:12–86:21, 129:15–133:7; McNeely Dep. at 55:12–57:24, 91:9–22, 131:4–22, 132:2–21; Medley Dep. at 67:9, 161:8–162:5; Perry Dep.

at 64:3–11; 68:14–69:19; Redd Dep. at 150:10–151:3; Robertson Dep. at 132:25–134:1, 142:8–16; Scott Dep. at 39:5–12; Singleton Dep. at 43:11–44:12, 45:3–9; Smart Dep. at 80:81–4; W. Smith Dep. at 76:22–77:14; Studstill Dep. at 179:7–180:20; Thornton Dep. at 54:6–55:17, 105:10–106:23; Wetherspoon Dep. at 109:20–114:6; *see also* Long Decl. ¶ 4.

For these reasons, the Court finds that the EEOC has created genuine issues of material fact regarding whether DHL honestly believed that the routes at issue were assigned based on legitimate, nondiscriminatory factors.

### b. Dock Work Assignments

DHL likewise contends that dock work assignments were premised on legitimate, nondiscriminatory factors. As to DHL's argument that a driver's bid for a station and time slot affected the dock assignments available to him or her, DSOF ¶¶ 25–26, it again misunderstands the EEOC's claim, which is based on the disproportionate amount of dock assignments that were handed out to Black drivers versus white drivers.

Second, DHL states that dock assignments were based on legitimate, nondiscriminatory factors, such as skill and experience. DSOF ¶ 30. But the evidence DHL cites says nothing about dock assignments. *Compare id.*, *with* Brandt Dep. at 133:14–135:6, 143:5–12, 221:19–222:14. And the EEOC points to evidence to dispute this proposition. For example, DHL's Rule 30(b)(6) witness, Thomas Reese, disavowed knowing any connection between an employee's knowledge and experience and his or her dock assignments. PSOAF ¶ 83 (citing Reese Dep. at 129:8–13). DHL's Senior Director of Labor Relations, James Pope, conceded that there was no special skill or experience required for sorting heavy freight. *Id.* (citing Pope Dep. at 39:8–10). Yates, who worked at DPA until 2008 and at ORD thereafter, stated that there is no specific skill or experience required to work in any area of the dock. *Id.* (citing Yates Dep. at 72:16–20). And Colella, who

worked at JOT prior to 2010 and ORD after that, admitted that a driver's skill and experience did not factor into assigning dock work. *Id.* (citing Colella Dep. at 35:4–7).

In addition, there is evidence that DHL supervisors, who assigned routes and dock work, harbored racist attitudes, from which a reasonable jury could infer that the supervisors acted with racially discriminatory intent. *See, e.g.*, Buffkin Dep. at 64:20–66:3 (Brandt); D. Jackson Dep. at 74:9–76:9, 78:1–5, 82:14–23, 85:10–86:12, 92:11–22, 94:20–95:24, 158:12–160:15 (Brewster); N. Jackson Dep. at 192:23–193:2 (Brandt); JC Johnson Dep. at 65:21–67:20 (Kogut); M. Johnson Dep. at 99:1–100:6 (Brandt), 137:22–138:7, 139:24–141:23 (McGrath); Medley Dep. at 67:9, 161:8–162:5 (Pehlke), 31:10–35:20, 47:4–8, 31:5–37:14, 147:6–149:2 (Colella, Ehrhardt); Miller Dep. at 84:17–22, 92:3–94:12 (Matwij); Murphy Dep. at 94:2–95:2 (Berdis); Robertson Dep. at 132:25–134:1 (Szajkovics); R. Robinson Dep. at 7:23–24, 35:3–5, 138:2–11 (Berdis), 122:22–125:14 (Brandt); Singleton Dep. at 123:20–22, 128:7–18, 129:5–24, 129:15–130:21 (Pehlke); Williams Dep. at 133:4–134:3 (Wiberding).

As such, the EEOC has created, at a minimum, genuine issues of material fact regarding whether DHL honestly believed that the assignment of dock work was predicated on legitimate, nondiscriminatory factors. Accordingly, DHL's motion for summary judgment as to the EEOC's and the remaining intervenors' race discrimination claims is denied

## B. Segregation Claims

Title VII makes it unlawful for an employer "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2). As noted above, "Section 1981 claims are evaluated under the same rubric as Title VII claims." *Williams*, 361 F.3d at 1028.

Unlike a Title VII discrimination claim, a Title VII segregation claim does not require an adverse employment action. *EEOC v. AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir. 2017) ("[W]e reject AutoZone's argument . . . that the lack of an 'adverse employment action' defeats a suit under § 2000e-2(a)(2)."). This is because a segregation claim under § 2000e-2(a)(2) "cast[s] a wider net" than a discrimination claim under § 2000e-2(a)(1). *Id.* Accordingly, a plaintiff need only establish that the action has a tendency to alter the terms and conditions of employment. *Id.*; *see also EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 824 (S.D. Ind. 2002) (denying summary judgment as to religious segregation claim where a reasonable jury could find that the employer's classification and segregation tended to alter the terms and conditions of employment); *EEOC v. J.C. Penney Co.*, 632 F. Supp. 871, 877–78 (E.D. Mich. 1985) (stating that the language in § 2000e-2(a)(2) requires only "a tendency to . . . adversely affect a protected group"). While an adverse employment action is not necessary to establish a segregation claim, pointing to one may create a triable issue of fact as to whether such a tendency has been established. *See AutoZone*, 860 F.3d at 569.

DHL argues that a segregation claim fails where the job in question was not performed exclusively by one race. In support, DHL cites *Steward v. New Chrysler*, 415 F. App'x 632 (6th Cir. 2011). In *Steward*, the court affirmed summary judgment for the defendant as to a plaintiff's discrimination claim, because she failed to establish an adverse employment action. *Id.* at 640. The court reasoned that, because the plaintiff admitted that employees chose their location on the assembly line based on seniority, her assertion that the assembly line was segregated by race was unsupported. *Id.* But *Steward* distinguishable, because the EEOC's segregation claim need not establish an adverse employment action. Furthermore, in contrast to the facts in *Steward*, DHL admits that routes and dock work were not determined by any bidding process where seniority

came into play.  DSOF ¶ 24.  And, viewing the record in the light most favorable to the EEOC, a reasonable jury could conclude that DHL supervisors primarily assigned Black drivers to the routes and dock work at issue.

DHL also relies again on *Nichols*, 432 F. Supp. 2d at 804.[45]  In *Nichols*, the district court recognized that "if the [employer] maintained racially segregated work areas . . . , it would certainly violate Title VII because such segregation would be based on race."  *Id.*  But because the *Nichols* plaintiffs provided no evidence that the decision to assign them to one location would have been different had the plaintiffs been white (everything else being equal), the court granted summary judgment in the defendant's favor.  *Id.*  In stark contrast to *Nichols*, however, there is evidence in this record that DHL supervisors assigned Black, but not white, drivers to certain routes and dock work in a manner that substantially separated Black drivers from white drivers.  For example, a rational jury could find that DHL supervisors segregated by race Black drivers to lift, sort, load, and unload freight, while primarily assigning white drivers to load their own trucks, scan freight, and scan letters.  *See, e.g.*, JC Johnson Dep. at 101:15–23, 126:2–3 (Pehlke's stating in response to a question as to why Black, but not white, drivers worked in the pit without any rotation at JOT: "Well, you are just doing what you guys are good at.  You are good laborers"); Green Dep. at 22:4–10, 36:13–17, 102:16–102:23 ("You would see a whole line of people one color and the other line of people of a different color.") (DPA); Lewis Dep. at 151:21–24 ("[It was] the same routine every night [at ORD], . . . the whites in this section, the [B]lacks in this section.  You would think that it was 1940s in the south").

---

[45]  DHL mistakenly relies on *Nichols* for the proposition that a segregation claim must fail where white employees voluntarily request to be placed in the same area as the Black plaintiffs.  This is incorrect.  *See* 432 F. Supp. 2d at 804.

There also exists evidence in the record from which a reasonable jury could conclude that DHL supervisors classified and segregated Black drivers to routes in predominantly Black, higher-crime areas or to more arduous routes, while assigning white drivers to other, more preferable routes.  PSOAF ¶ 8; Long Decl. ¶ 4; *see* JC Johnson Dep. at 65:21–67:20 (manager Kogut telling Black driver that he was assigned to a route in a Black neighborhood because a white driver would stick out like a sore thumb); Haven Dep. at 125:7–129:10 (stating that white driver was sent to non-city routes while he was assigned to city routes); McCall Dep. at 129:15–133:7 (complaining to manager Kogut about white drivers ridiculing him about his inner city routes and bragging that they never had to drive such routes); Fefee Dep. at 126:16–127:16, 135:11–136:3 (complaining nearly every day to unreceptive supervisors that Black, but not white, drivers were assigned to routes in primarily Black, higher-crime neighborhoods); Medley Dep. at 67:9, 161:8–162:5 (Pehlke's answering the question as to why Black, but not white, drivers were assigned to Englewood by stating, "you guys are tough"); Robertson Dep. at 132:25–134:1 (supervisor Szajkovics's telling Robertson that he was assigned to a route in a predominantly Black, higher-crime area because he could "interact with them better"); N. Jackson Dep. at 192:23–193:2 (Brandt stating that he assigned Black drivers to routes in more dangerous neighborhoods because they can "get in and get out").

To the extent DHL asserts that white drivers were assigned to the same routes as Black drivers to the same degree, the portions of the record that it cites do not support this contention. *Compare* DSOF ¶ 68, *with* Resp. DSOF ¶ 68.  Likewise, insofar as DHL contends that white drivers were assigned to routes in predominantly Black, higher-crime areas, the evidence in the record upon which it relies is either unsupportive or, at most, supports the notion that white drivers occasionally filled in on such routes. *Compare* DSOF ¶ 67, *with* Resp. DSOF ¶ 67.  And inasmuch

as DHL points to evidence that a dozen Black drivers sometimes drove routes in whiter, safer areas, *see* DSOF ¶ 69, this merely creates triable issues of fact as to whether Black drivers were disproportionately assigned to routes in predominantly Black, higher-crime areas.

Accordingly, DHL's motion for summary judgment as to the EEOC's and the remaining intervenors' segregation claims is denied.

## C.    Punitive Damages

Title VII authorizes an award of punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001) (quoting 42 U.S.C. § 1981a(b)(1)).  The Supreme Court in *Kolstad v. American Dental Association* created a three-part framework for determining whether an award of punitive damages is appropriate under Title VII.  *See* 527 U.S. 526, 535–45 (1999).

First, a plaintiff must "demonstrate that the employer acted with the requisite mental state." *Bruso*, 239 F.3d at 857.  "A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws."  *Id.* at 858.  "A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions.  *Id.*

Second, "[o]nce a plaintiff has established that the defendant, or its employees, acted in reckless disregard of his federally protected rights, he must establish a basis for imputing liability to the employer."  *Id.*  This "inquiry should be controlled by general principles of federal agency law."  *Id.*

Third, even if the plaintiff establishes the first two elements, an "employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.* On this element of the *Kolstad* test, the defendant bears the burden of proof. *Id.* at 858–59.

"[A]though the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award." *Id.* at 858. "Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." *Id.* at 858–59. The following are indicators that an employer has not made a good faith effort at Title VII compliance: (1) supervisors appear to be ignorant of what constitutes a Title VII violation, *see Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000); (2) management provides cursory investigations into complaints of Title VII violations, *see Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000); (3) management fails to respond effectively to complaints of Title VII violations, *see Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999); and (4) employees feel intimidated and express fear of retaliation for complaints of Title VII violations, *see Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000).

DHL argues that, even if the EEOC could establish the first two elements, summary judgment should be still granted in DHL's favor with regard to punitive damages, because it made good-faith efforts to comply with Title VII. Unsurprisingly, the EEOC disagrees. While it is undisputed that DHL had formal written policies against discrimination, the parties have each pointed to portions of the record to support their opposing positions.

DHL states that it posted its anti-discrimination policy at each station, that it periodically provided regular training on its policy, that drivers were aware that they could file a grievance regarding race discrimination under the CBA, that drivers knew they could telephonically report discriminatory conduct through Powerline, and that its HR department investigated complaints and issued discipline if there was a finding to substantiate the complaint. DSOF ¶¶ 99, 107, 110, 112, 118. The EEOC disputes this.

In response, the EEOC not only relies on the account of the drivers, but also notes that, as a Senior Generalist in DHL's HR department, Kogut assisted in the investigation of numerous race discrimination complaints and found none of them to be substantiated, thereby casting doubt on DHL's efforts to address racial discrimination complaints. *See id.* ¶¶ 6, 11–20; *compare* DSOF ¶ 122, *with* Resp. DSOF ¶ 122. As the EEOC points out, prior to being promoted to the HR position, Kogut was the manager at JOT, Kogut Decl. ¶¶ 2–3, and there are certain facts in the record (disputed by DHL) that elucidate Kogut's view of racial discrimination complaints.

Long recalls that, when Kogut was at JOT, Kogut denied his repeated requests to have Black drivers cross-train on routes driven by white drivers. Long Decl. ¶ 4. And, according to JC Johnson, Kogut told him to stop being a crybaby when he complained that Pehlke had said, "Just act like you are picking cotton." JC Johnson Dep. at 126:2–15. Anthony McCall states that, when he complained to Kogut that white drivers were ridiculing Black drivers for always being assigned to inner city routes, Kogut told McCall that he would discuss route assignments with the supervisors, but nothing ever changed. McCall Dep. at 129:15–133:7. And Alonzo Studstill complained to HR on numerous occasions about being subjected to harassment and racism by Colella and Kogut, but he never received a response from HR. Studstill Dep. at 164:18–170:9. Granted, all of these facts are disputed, but there are enough facts here from which a rational jury

could conclude that Kogut's review of race discrimination complaints while in HR was tainted by prior racial bias.

In addition, the EEOC asserts (and DHL disputes) that, when most Black drivers complained about race discrimination to HR, an HR representative would only speak to the driver and the pertinent manager or supervisor, and, like Kogut, would then find the complaint unsubstantiated. PSOAF ¶ 131; *see also* White Dep. at 80:6–23, 110:24–111:20, 113:20–114:15, 127:9–18 (stating that nothing changed after complaining to HR that only Black drivers were assigned to heavy lifting in the pit). For instance, when two drivers complained to HR about assignments being based on race, the individual drivers were temporarily reassigned, but HR did not investigate the systemic nature of their complaints. PSOAF ¶ 133; *see* Haven Dep. at 84:3– 23, 131:17–132:6 (stating that any relief that might come from complaining would only be temporary); *cf.* Thornton Dep. at 81:8–82:11 (stating relief after complaining lasted a few days). The EEOC also notes that, despite numerous complaints of race discrimination from drivers about Brandt at DPA and ORD, DHL's HR Director recalls discussing racial sensitivity with Brandt only on one occasion. *Compare* PSOAF ¶ 132, *with* Def.'s Resp. PSOAF ¶ 132.

Furthermore, the EEOC has cited to evidence that supervisors harassed, punished, or threatened to punish Black drivers for complaining about racially discriminatory job assignments. *See, e.g.*, M. Johnson Dep. at 105:1–108:23, 169:1–170:23; J. Jones Dep. at 69:22–70:10; McNeely Dep. at 107:14–17, 131:4–22; Medley Dep. at 186:19–188:14; Price Dep. at 74:19– 77:24; R. Robinson Dep. at 85:24–86:7; S. Robinson Dep. at 90:6–7; Scott Dep. at 34:6–22, 42:8– 15, 45:11–18.

Thus, when viewing the disputed facts in the light most favorable to the EEOC and the remaining intervenors, as the Court must on summary judgment, there exist genuine issues of

material fact as to whether DHL supervisors were sufficiently trained to address racial discrimination complaints, whether DHL's management responded effectively to such complaints, and whether Black drivers felt intimidated and/or feared retaliation for filing grievances or raising complaints of race discrimination. Accordingly, DHL's summary judgment motion as to punitive damages is denied.

**D.     Chart of Claims**

For ease of the reader, the Court has included a chart as Appendix A that indicates whether the claims of a particular driver survive summary judgment. The chart is subdivided by station—JOT, DPA, and ORD. Columns contain the station code and: (1) "R" indicating a claim based on one or more route assignments, (2) "D" indicating a claim based on dock assignments, (3) "S" indicating a claim based on segregation, and (4) "P" indicating a claim for punitive damages. Any claim marked with an "O" indicates that the Court grants summary judgment in DHL's favor as to that claim. Any claim marked with an "X" indicates that the Court denies summary judgment as to that claim. Any dark shaded blank area indicates that the driver did not work at the station during the relevant time frame. Finally, where "RI" appears next to a driver's name, this indicates that the driver is a remaining intervenor.

## IV.     <u>Conclusion</u>

For the reasons provided above, DHL's motion for summary judgment is granted in part and denied in part, as set forth in Appendix A.

**IT IS SO ORDERED.**                    **ENTERED: December 30, 2021**


_John Z. Lee_
**United States District Judge**

# Appendix A

| | Name | JOT-R | JOT-D | JOT-S | JOT-P | DPA-R | DPA-D | DPA-S | DPA-P | ORD-R | ORD-D | ORD-S | ORD-P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Akenton, Maxwell | X | O | X | X | | | | | | | | |
| 2 | Allen, Calvin | O | X | X | X | O | X | X | X | O | X | X | X |
| 3 | Anderson, Darrell | | | | | | | | | O | X | X | X |
| 4 | Azor, Philip | O | O | O | O | | | | | | | | |
| 5 | Bailey, Reginald | O | X | X | X | | | | | O | X | X | X |
| 6 | Bonslater-Burnett, Alma | X | O | X | X | | | | | | | | |
| 7 | Brantley, Andrea | | | | | | | | | O | X | X | X |
| 8 | Briscoe, Kenneth **(RI)** | X | X | X | X | O | X | X | X | | | | |
| 9 | Britton, Thomas | | | | | | | | | O | X | X | X |
| 10 | Brown, Derwin | O | O | O | O | O | X | X | X | O | O | O | O |
| 11 | Buffkin, Shurray | | | | | X | X | X | X | | | | |
| 12 | Calhoun, Anthony | | | | | O | X | X | X | O | O | O | O |
| 13 | Cummings, Kevin | O | X | X | X | | | | | | | | |
| 14 | Dean, Oliver **(RI)** | O | X | X | X | O | X | X | X | O | O | O | O |
| 15 | Edwards, Melvin **(RI)** | | | | | O | O | O | O | O | X | X | X |
| 16 | Ellis, John **(RI)** | | | | | O | X | X | X | | | | |
| 17 | Fefee, David | X | O | X | X | | | | | O | O | O | O |
| 18 | Fields, Percy | X | X | X | X | | | | | | | | |
| 19 | Ford, Ronnie **(RI)** | | | | | X | X | X | X | | | | |
| 20 | Foster, DeMarco | O | O | O | O | | | | | O | O | O | O |
| 21 | Fulks, Michael | | | | | | | | | O | X | X | X |
| 22 | Gilbert, Paul | O | O | O | O | X | O | X | X | O | O | O | O |
| 23 | Green, Nicholas | O | O | O | O | O | X | X | X | | | | |
| 24 | Green-Riley, Benita | X | X | X | X | O | X | O | O | O | X | X | X |
| 25 | Haven, Johann | X | O | X | X | | | | | | | | |
| 26 | Hayes, Jimmie | | | | | O | X | X | X | O | X | X | X |
| 27 | Hill, Felicia | X | X | X | X | O | O | O | O | O | O | O | O |
| 28 | Hopkins, Philip | | | | | O | O | O | O | O | X | X | X |
| 29 | Huggins, Lisa | | | | | O | X | X | X | O | X | X | X |

| # | Name | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | Jackson, Demario | | | | | X | X | X | X | | | | |
| 31 | Jackson, Nathaniel **(RI)**\* | | | | | X | O | X | X | O | O | O | O |
| 32 | Johnson, Christopher | | | | | O | X | X | X | O | O | O | O |
| 33 | Johnson, JC | X | X | X | X | | | | | | | | |
| 34 | Johnson, Michael **(RI)** | | | | | X | X | X | X | | | | |
| 35 | Jones, Joseph | X | X | X | X | | | | | | | | |
| 36 | Jones, Sean | | | | | | | | | O | X | X | X |
| 37 | Jordan, Anthony | X | X | X | X | | | | | | | | |
| 38 | Kelly, Allan | X | X | X | X | | | | | | | | |
| 39 | Kelly, Reginald | | | | | O | X | X | X | | | | |
| 40 | Lester, Miranda **(RI)** | | | | | O | O | O | O | | | | |
| 41 | Lewis, Leslie (male) | | | | | | | | | O | X | X | X |
| 42 | Lowe, Michael | X | X | X | X | | | | | | | | |
| 43 | Lyons, Robert | | | | | O | X | X | X | | | | |
| 44 | Martin, Charles | X | X | X | X | | | | | | | | |
| 45 | May, Edward | | | | | | | | | O | X | X | X |
| 46 | McCall, Anthony | X | X | X | X | | | | | O | X | X | X |
| 47 | McNeal, Aldrich | O | X | X | X | | | | | O | X | X | X |
| 48 | McNeely, Sandra | X | X | X | X | | | | | | | | |
| 49 | Medley, Edgar **(RI)** | X | X | X | X | | | | | O | X | X | X |
| 50 | Miller, Erskine | X | O | X | X | | | | | | | | |
| 51 | Murphy, Alonzo | | | | | | | | | O | X | X | X |
| 52 | Noys, Antonio | O | X | X | X | | | | | | | | |
| 53 | Oliver, Landers | | | | | | | | | O | X | X | X |
| 54 | Perry, Angela | X | O | X | X | O | O | O | O | O | O | O | O |
| 55 | Price, Timothy **(RI)** | | | | | X | X | X | X | | | | |
| 56 | Quarles, Chris | | | | | | | | | O | X | X | X |
| 57 | Reams, Lewis | O | X | X | X | O | X | X | X | O | X | X | X |
| 58 | Redd, Willie | X | X | X | X | | | | | | | | |
| 59 | Robertson, Allan | X | X | X | X | O | O | O | O | O | O | O | O |
| 60 | Robinson, Aubrey | | | | | | | | | O | X | X | X |
| 61 | Robinson, Ryan | O | O | O | O | X | X | X | X | O | O | O | O |
| 62 | Robinson, Sharon | O | O | O | O | O | X | X | X | | | | |
| 63 | Scott, John | X | X | X | X | | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 64 | Shields, Millicent | O | O | O | O | | | | | | O | X | X | X |
| 65 | Singleton, Renard | X | X | X | X | O | O | O | O | | O | O | O | O |
| 66 | Smart, Kirby | X | X | X | X | | | | | | O | O | O | O |
| 67 | Smith, Curtis | | | | | | | | | | O | X | X | X |
| 68 | Smith, Darrell | | | | | | | | | | O | X | X | X |
| 69 | Smith, William | X | O | X | X | | | | | | | | | |
| 70 | Stewart, Gregory | O | X | X | X | | | | | | | | | |
| 71 | Stewart, Loron | X | X | X | X | | | | | | | | | |
| 72 | Street, Toxey | | | | | | | | | | O | X | X | X |
| 73 | Studstill, Alonzo **(RI)** | X | X | X | X | | | | | | | | | |
| 74 | Thomas, Paul **(RI)** | | | | | O | X | X | X | | | | | |
| 75 | Thompson, Randy | | | | | O | X | X | X | | | | | |
| 76 | Thornton, Jerry | X | X | X | X | | | | | | O | X | X | X |
| 77 | Washington, Sharee **(RI)** | O | X | X | X | | | | | | O | O | O | O |
| 78 | Wetherspoon, Ricky | X | O | X | X | | | | | | | | | |
| 79 | White, George **(RI)** | | | | | O | X | X | X | | O | X | X | X |
| 80 | Williams, Arthur | | | | | | | | | | O | X | X | X |
| 81 | Williams, Sandra | O | O | O | O | O | X | X | X | | | | | |
| 82 | Willis, Sheldon | | | | | | | | | | O | X | X | X |
| 83 | Young, Jamaine | X | X | X | X | | | | | | O | O | O | O |

\*=   DHL's summary judgment motion is granted as to Intervenor Nathaniel Jackson's CHI-based claims.